BEFORE THE WORKERS' COMPENSATION BOARD OF

THE STATE OF OREGON

| | | |
|---|---|---|
| In the Matter of the Compensation | ) | WCB Nos. 2305510, 25-02754 |
| | ) | |
| of | ) | Claim No. 202301427810 |
| | ) | |
| JUSTIN M. CALLAWAY, Claimant | ) | TRANSCRIPT OF PROCEEDINGS |

APPEARANCES:          For the Claimant:          Jodie Phillips Polich
                                                                        Attorney at Law
                                                                        Milwaukie, Oregon

                                      For the Defendant:          Linh T. Vu
                                                                        Attorney at Law
                                                                        Portland, Oregon

Workers'
Compensation Board
Hearings Division

The proceedings in the above-entitled matter were held telephonically in Portland, Oregon, on the 10th of June, 2025 at 9:17 a.m., before Halah Ilias, Administrative Law Judge for the Workers' Compensation Board of the State of Oregon.

-i-

-ii-

## INDEX OF WITNESSES

CLAIMANT'S:                                                          PAGE

JUSTIN M. CALLAWAY

Direct Examination                                              7

ReDirect Examination                                          93

ReCross Examination                                          107


DEFENDANT'S:

SCOTT KONCZAL

Direct Examination                                             10

Cross Examination                                              59

ReDirect Examination                                          67


VIKI BISBY

Direct Examination                                             70

Cross Examination                                              72

ReDirect Examination                                          87


*Closing Arguments*                                           *108*

Workers'
Compensation Board
Hearings Division

## INDEX OF EXHIBITS

| EXHIBITS: | MARKED: | ADMITTED: | NOT ADMITTED: | WITHDRAWN: |
|---|---|---|---|---|
| 1 through 19 | 2 | 2 | | |
| 20 | 91 | | | |

Workers'
Compensation Board
Hearings Division

TRANSCRIPT OF PROCEEDINGS

THE ALJ: We are on the record. This is the time and place for hearing in the matter of the compensation of Justin Callaway, WCB Case Numbers 23-05510 and 25-02754. This telephonic hearing is being convened on June 10, 2025, in Portland, Oregon before Administrative Law Judge Halah Ilias. The worker is present and is represented by his attorney, Ms. Jodie Phillips Polich. The employer, City of Portland, is represented by their attorney, Ms. Linh Vu. She also has Lieutenant Scott Konczal-- and I don't know if I said that appropriately-- with her today. Mr. Konczal, did I say that properly?

MR. KONCZAL: It's Konczal with a Z.

THE ALJ: Okay.

MR. KONCZAL: You don't really pronounce the C sound.

THE ALJ: Thank you.

MR. KONCZAL: No problem.

THE ALJ: Does Claimant waive a reading of their rights and procedures?

MS. PHILLIPS POLICH: Claimant waives.

THE ALJ: Does the employer waive a reading of their rights and procedures?

MS. VU: Yes, the employer waives.

THE ALJ: Thank you. And my understanding of the issues is a-- is that there is an October 13, 2023, denial of a mental stress condition, attorney fees, costs, and penalties. Jodie, is that correct?

MS. PHILLIPS POLICH: Correct and the penalty issue is for

unreasonable denial under ORS 656.262(11)(a) because of the City of Portland failing to conduct a reasonable investigation before denying the claim.

THE ALJ: Thank you. Ms. Vu, does that sound appropriate to you?

MS. VU: It does.

THE ALJ: Thank you. Moving on to the exhibits. The exhibits being submitted in this case include what have been marked as Exhibits 1 through 15 submitted by the employer on June 10, 2024, Exhibit 16 submitted by the employer on June 9, 2025, Exhibit 17 submitted by Claimant on June 9, 2025, Exhibit 18 which I should be receiving shortly submitted by Claimant on June 10, 2025 and finally, Exhibit 19 submitted by the employer on June 10, 2025. Does Claimant have any objection to any of these exhibits?

MS. PHILLIPS POLICH: Claimant has no objection.

THE ALJ: Does the employer have any objection to any of these exhibits?

MS. VU: The city has no objections.

THE ALJ: Exhibits 1 through 19 are admitted into the record. And Ms. Phillips Polich, will the record be closing today?

MS. PHILLIPS POLICH: From my perspective, yes.

THE ALJ: And Ms. Vu?

MS. VU: Yes.

THE ALJ: Okay, thank you. All right, Ms. Phillips Polich, your opening statement.

MS. PHILLIPS POLICH: Thank you. Judge, the ultimate question that you're charged with determining is whether or not Mr. Callaway's claim is compensable. Today, you will hear from Mr. Callaway about the circumstances that

Workers'
Compensation Board
Hearings Division

-3-

led up to his filing this claim in October of 2023 about-- based on his employment conditions with the City of Portland. Candidly, today you're not going to hear a lot from Mr. Callaway as my hearing notice reflects-- and I'm going to talk a little bit about this, but Mr. Callaway is neurodivergent and so one of the main reasons I submitted Exhibit 16 was to attempt to streamline the proceedings so that-- so that Mr. Callaway is able to stay focused appropriately on the-- on the issues that are-are pertinent for today's hearing.

Mr. Callaway worked for the City of Portland as a Police Administrative Support Specialist for the Portland Police Bureau. The employment conditions leading to Mr. Callaway's claim are his employer's disregard for his safety and his safety complaints. Mr. Callaway identifies as neurodivergent and is diagnosed with ADHD and-and autism spectrum disorder. His workers' compensation claim is for PTSD referred to in this record as complex PTSD and chronic PTSD. Mr. Callaway's work environment included working with sworn officers who carried guns and wore badges. He did not. His job involved working on investigations into police misconduct. Mr. Callaway trusted the system would work, and ultimately none of them did for him, and ultimately this resulted in him being made the wrong person for the right job for him. This Claimant has repeatedly asked for discussion about his safety concerns with desperate pleas for help that were repeatedly met with a lack of response from his employer and supervisors including both words and actions making it clear that his safety concerns were not going to be discussed or addressed.

At the end of the day, while Mr. Callaway was not a sworn officer, he experienced the same risks without the same protections. And Mr. Callaway's burden to prove his stress claim is compensable under ORS 656.802(3) which

Workers'
Compensation Board
Hearings Division

requires that he establish all of the following: the employment conditions producing a mental disorder exist in a real and objective sense; the employment conditions producing the mental disorder are conditions other than conditions generally inherent in every working situation, or reasonable disciplinary corrective or job performance evaluation actions by the employer or cessation of employment or employment decisions attendant upon ordinary business or financial cycles. There must also be a diagnosis of a mental or emotional disorder which is generally recognized in the medical or psychological community, and there's clear and convincing evidence that the mental disorder arose out of and in the course of employment.

Judge, I know that you're well familiar with these criteria and the difficulties for hurdles present to workers in establishing a compensable-compensable stress or mental disorder claim. The purpose of referencing these statutes is because they create the framework for the testimony that you will hear today from Mr. Callaway as well as analyzing the evidentiary record. Mr. Callaway will be relying on the opinions of his attending providers. In this case, that's LPC Don Marr as well as Heidi, whose last name I will probably butcher, but Bermeosolo and, it is Mr. Callaway's position that after listening to all of the testimony and evaluating evidentiary record, you will find he has met his burden of proof in establishing a compensable mental health claim under ORS 656.802. Mr. Callaway is seeking an order setting aside the City of Portland's denial along with an award of assessed attorney fees and costs should he prevail along with penalties for unreasonable denial under ORS 656.262(11)(a) because the City of Portland failed to conduct a reasonable investigation before denying the claim. Thank you.

THE ALJ: Thank you. Ms. Vu?

Workers'
Compensation Board
Hearings Division

-4-

MS. VU: Thank you, Your Honor. Justin Callaway started working for the City of Portland in October 2019. Specifically, he worked for Portland Police Bureau as a Police Administrative Support Specialist and that-- the acronym for that position is P-A-S-S, so you'll be hearing it referred to as PASS. This position is really clerical support, and he was stationed in the Internal Affairs Division. Today, you will hear testimony from Mr. Callaway's supervisor, Lieutenant Scott Konczal, about the lieutenant's experience working with and supervising Mr. Callaway. Despite constant coaching and giving Mr. Callaway a wide degree of latitude, Mr. Callaway was an underperforming employee. In addition, you will hear testimony from the lieutenant about Mr. Callaway's numerous complaints which tended to grow and morph the more often they were repeated, and those complaints were repeated often to pretty much everyone who would listen.

The test-- the lieutenant's testimony will also provide you with a timeline of how Mr. Callaway's presentation at work changed from affable and talkative to hostile and paranoid culminating in Mr. Callaway taking medical leave in the spring of 2023. The lieutenant will also testify to Mr. Callaway's final day where he would-- when he was specifically at work in July 2023 where he confronted and yelled at Captain Greg Pashley and caused consternation among staff that were present resulting in him being placed on administrative leave. You will then see in the exhibits that after Mr. Callaway was put on administrative leave, there were efforts from the City's Human Resources Business Partner, Kristina Porreco, to work with Mr. Callaway and his provider at the time and this would be Ms. Bermeosolo to assess whether Mr. Callaway could return to work with an ADA accommodation. Those efforts ultimately proved unsuccessful for various reasons.

The exhibits-- his statement to IPR, excuse me, the Independent

Workers'
Compensation Board
Hearings Division

-5-

-6-

Police Review, at Exhibit 16, Page 18, Mr. Callaway acknowledges that by this point he was running out of paid leave. He thus filed the present workers' compensation claim. Risk management, the entity that-- within the city that processes and investigates workers' compensation claims on behalf of the city, received the claim. Viki Bisby, a senior claims analyst with the city, investigated the claim and talked with multiple individuals at PPB before making the decision to issue the denial of this claim. That concludes my opening statement. Thank you.

THE ALJ: Thank you. All right, Ms. Phillips Polich, anyone you would like to call today?

MS. PHILLIPS POLICH: Yes, I am going to call Mr. Callaway, please.

THE ALJ: Thank you.

JUSTIN M. CALLAWAY,

called as a witness on his own behalf, having been first duly sworn, was examined and testified as follows:

THE ALJ: And is your-- is your address 2313 Southeast Yamhill Street, Portland, Oregon, 97214?

THE WITNESS: Yes, it is and the City Attorney's office and PPB knew this.

THE ALJ: Oh, okay. Thank you. All right, Ms. Phillips Polich, go ahead, please.

//

//

//

Workers'
Compensation Board
Hearings Division

DIRECT EXAMINATION

(BY MS. PHILLIPS POLICH:)

Q. Mr. Callaway, who was your employer on May 25, 2023?

A. The City of Portland, Portland Police Bureau.

Q. Okay. And how long had you worked for the City of Portland?

A. I had started I believe on October 3, 2019.

Q. Okay, and what was your job title?

A. It was called Police Administrative Support Specialist; PASS, and I was involuntarily assigned to Internal Affairs upon hire.

Q. Okay. Can you tell us what your job duties were at the City of Portland as a Police Administrative Support Specialist, what your-- basically what your day of work kind of looked like?

A. Sure. I would handle phone calls from members of the public with complaints about police interactions. I would help facilitate investigations into police misconduct by any other city employee or by any member of the public. I supported-- as the last member to receive remote working capabilities and had to work in person, I supported all my other coworkers with their ability to work remotely as well as running the physical office and ordering supplies, dealing with vendors, facilities requests, helping troubleshoot issues, handling mail including sending letters of acknowledgement or declination letters to anybody who had made a complaint about any PPB member.

Q. Okay. And in our record, you heard us talk about-- Ms. Vu and I in our opening statements-- talked a little bit about a transcribed-- well, what's titled a Confidential Recorded Interview Transcript that you gave to the City of Portland on December 14, 2023. Have you had a chance to review a copy of that?

Workers'
Compensation Board
Hearings Division

CALLAWAY -D- -7-

A. Yes.

Q. And is it accurate?

A. It's factually accurate, but there are typos. For instance, Sergeant Konczal was included, and you can't tell that in the transcript.

Q. Okay.

A. And I don't think the-- I think the emotional context is missing.

Q. All right. When you say the emotional context is missing, what do you mean by that?

A. That I was in tears, and it was very troubling to have someone tell me to look them in the eyes.

Q. Okay. In 2023, did you seek treatment for your mental health issues associated with this incident?

A. Yes.

Q. And who was your medical provider for your mental health conditions back in 2023?

A. I had recently found and contacted Heidi Bermeosolo.

Q. And had you discussed your experiences stemming from your employer's disregard for your safety with Heidi Bermeosolo?

A. I did. My workplace concerns were primary.

Q. Okay. And who is your current mental health provider?

A. My therapist is Don Marr, and he was hired to help me with decluttering. Instead, he's been treating PTSD issues related to work this whole time.

Q. Okay. And have you discussed your experiences stemming from your employer's disregard for your safety with Don Marr?

A. I have, very much so.

Workers'
Compensation Board
Hearings Division

CALLAWAY -D- -8-

Q. I don't--

A. We started working pretty much around the same time in early May of 2023, so he was already working with me prior to FMLA, and I shared--

Q. Okay, that's okay. All right, remember, I ask the questions and--

A. Yes.

Q. -- Ms. Vu is going to ask questions, all right? I know that's hard.

A. Yes.

MS. PHILLIPS POLICH: Okay? All right. I don't have anything else for Mr. Callaway.

THE ALJ: Ms. Vu?

MS. VU: I don't have anything for Mr. Callaway either.

THE ALJ: Thank you. Ms. Phillips Polich, anyone else you would like to call?

MS. PHILLIPS POLICH: I don't have any other witnesses.

THE ALJ: Okay. Ms. Vu, is there anyone you would like to call?

MS. VU: Yes, Your Honor.

THE ALJ: Okay.

MS. VU: I'd like to call Lieutenant Scott Konczal.

THE ALJ: Okay. Mr. Konczal, can you please--

LIEUTENANT SCOTT KONCZAL,

called as a witness in behalf of the defendant, having been first duly sworn, was examined and testified as follows:

THE ALJ: Great. Could you please state your name and spell it for

Workers' Compensation Board Hearings Division

CALLAWAY -D- -9-

the record?

THE WITNESS: Yes, my name is Scott Konczal and my-- it's S-C-O-T-T. My last name is K-O-N-C-Z-A-L.

THE ALJ: Thank you. Ms. Vu, go ahead please.

MS. VU: Thank you.

<u>DIRECT EXAMINATION</u>

(BY MS. VU:)

Q. Lieutenant, who do you currently work for?

A. I work for the City of Portland with the Police Bureau.

Q. And how long have you worked for PPB?

A. Since May of 2011.

Q. Could you provide us with a little bit of history with your-- of your work with PPB?

A. Yeah, so I spent most of my time on patrol, almost all of it at a precinct here in Portland. I worked at the North Precinct for about six years as an officer and then got promoted to sergeant. After being a sergeant for a couple of years, I remained at North Precinct and then there was an opportunity to work at Internal Affairs which was, like, really kind of outside of what I had done my whole career. I had never imagined working at Internal Affairs. That was a cool opportunity to learn new stuff, do something different, and as a sergeant, I went over to Internal Affairs and I worked there from the fall of 2018 to April of 2024, so about five and a half to six years at Internal Affairs as a sergeant and as an acting lieutenant.

Q. Do you have any other prior law enforcement experience?

A. Yeah, I worked for the City of Detroit in Detroit, Michigan where I was an officer there for seven years and I had got promoted to sergeant, and I was a sergeant there for six years and when I left Detroit, it was specifically to come to Portland so the-- I think I left Detroit-- I turned in my badge on May 26th and I flew out to Portland and was sworn on May 27, 2011. So, there was really no gap and I've been employed in law enforcement as a sworn officer, sergeant, and lieutenant since 1998.

Q. All right, so altogether, 27 years. Does that sound correct?

A. Yes.

Q. Do you know the Claimant, Justin Callaway?

A. I do, yes.

Q. And how do you know Mr. Callaway?

A. At some point in 2019, Justin was hired as a new PASS in the Internal Affairs office. So, there were-- at varying times, there were either two or three PASSes in the Internal Affairs office because it is an administrative office. It is almost entirely all paperwork. It is not law-- it's not a law enforcement unit within the police bureau. It is all processing paperwork, administrative investigations, and supervisory investigations. So, it's paper heavy. It's administration heavy, and for that reason, there was-- at times there were two PASSes and at other times we had three PASSes, and one of those PASSes is a senior PASS who's kind of like a supervisor of the other two.

Q. Is it more like a lead worker or a supervisor?

A. It's more like a lead.

Q. All right. And what-- are you familiar with what Justin's job duties were at the time?

Workers'
Compensation Board
Hearings Division

A. Yeah, as a-- so, as a new PASS, any time a case or a complaint would come into the office, it would stop at the administrative desk first, and then from there it would go to whoever it was intended for. So, if it was a complaint coming into the office, it would go to one of the administrative support specialists. They would make sure the paperwork was in order, and then they would send it to a supervisor-- a sergeant-- which would be me or Alicia Russell. We would review the complaint and make sure that it's in order and then assign it either to a precinct to investigate, which would be a supervisory investigation, or an investigator-- an IA investigator to investigate which would be an internal investigation. After we made the decision that everything was in, like proper order, the complaints were written out correctly, we would assign it to an investigator or a precinct, and send it back to admin. Admin would ensure everything was in its proper place, proper order, the file was all put together, then send it to whoever the supervisor assigned it to. So, the administrative support specialists were kind of like a pitstop for everything that came or went from the office. And some of the-- I would say the entry level tasks were like and the supervisory investigations, those were some of the-- I would say, lower priority investigations because they dealt with minor misconduct and they were finished relatively quickly. Like, a supervisory investigation would be done within a few weeks to a month, where an internal investigation could take up to six months to a year. So, a supervisory investigation were a lower priority, and everything's done on a timeline. And so, the lower priority things that got done within a month or two months, like a supervisory investigation, those were the types of things that were assigned to Justin. Justin was good at taking calls from the public because he was-- when he was first hired, he was very affable, very friendly. I thought he had good intentions and tried to be very helpful. And so, yeah, that was my-- the beginning of

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -12-

my-- how I got to know Justin.

Q. All right, so just to clarify, the PASS employees are civilian employees who-- and for Mr. Callaway specifically-- their tasks are primarily clerical in function. Does that sound accurate?

A. Yeah, they're entirely clerical in function.

Q. Okay. And then, any investigation moves up to sworn employees-- the lowest ranking sergeant?

A. The sergeants-- the-the internal affairs office only has a handful of sworn employees, two sergeants, a lieutenant, and a captain. Everybody else in the internal affairs office is a nonsworn civilian employee. Most of them are former law enforcement, but--

Q. Okay.

A. -- they're all nonsworn civilian employees.

Q. Okay, got it. Thank you for clarifying that for me. So, you've already talked a little bit about how you found Mr. Callaway's job performance when you had first started working with him. Could you describe a little bit what your approach was like just supervising him? Did he need a lot of guidance or job correction? How did he interact with others?

A. Well, very early on it became problematic that Justin was talkative, and I mean, that is-- that's understating it. Justin would spend an awful lot of time talking to myself, the other supervisors, the investigators, and he spent an awful lot of time talking and one of the more important aspects of being in internal affairs is the timelines of the investigations. Because of the way he would communicate and not-- he would even say that I know I have a tendency to talk on and on, you know. It's okay to stop me. You can be direct with me and tell me because I know I have a

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -13-

tendency to just go on and on and then talk a long time. And so, keeping him focused on his job was like the main issue that I had with him. He's very-- like I said, he was friendly. He was helpful. He was very polite, but keeping him focused on his job was probably like the main challenge with Justin, and I got to a point where I relied on the phrases like, Justin, I need to redirect you right now. I need you to focus on your work. I need you to return to your desk. I need you to re-- I need to redirect you back to your job right now. I need you to go to your duties or-- I'd often say like, at some point, I would just have to say, like, I need to redirect you right now. And that was a-a friendly and professional way of putting it because it did become something very-- everybody noticed very early on how much time he spent talking about things not related to work, and the difficulty he had focusing on any specific topic. So, it wasn't just like he was talking. I mean it was kind of hard to follow a lot of what he was saying. I mean, you could get the basics of it, but he would go on and on and on and that was a problem pretty evident from the very beginning.

Q. And you described his initial presentation as affable and friendly. Did things change at some point?

A. Yeah, over-- so, if you-- my experience with Justin, I think he got hired in-- sometime in 2019, maybe the fall of 2019, and then he worked up until-- the last time I saw him was sometime in 2023. It was, like June or July, the summer of 2023. So, I knew him for four years, and over the course of those four years, I got to know Justin fairly well. He would often confide in me some of his struggles-- just some of his struggles, like, neurologically, like, he confided in me like some of the medications that he was taking. He confided in me that he had trouble with ADD and at one point he told me about autism. I have a daughter who's on the spectrum. My oldest daughter is on the spectrum and that was-- as a parent, raising a child

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -14-

who is on the autism spectrum, I kind of felt for Justin, and wanted him to feel welcome in the workplace. Just viewing it through that lens. And watching him as he interacted with people and lacking the self-awareness that, like, you know, that person that you're talking to obviously wants to get back to work. Like, that person you're talking to right now is trying to leave the office. They're trying to walk out the door and you're continuing to talk to them and you're saying things like, I know I'm talking too much, like, I know you've got to get going. I'll see you next week and maybe then we can talk a little bit more about this, this, and this, and you watch the conversation go on and on and-and I felt for him. Like-- and so sometimes I'd have to interject, like, hey Justin, I need to talk to you for a minute, just so he would let the other person either leave or go back to their job or whatever. So, some of his duties were scaled back to something that he could accomplish, and it was mostly SIs and answering the phone and grabbing mail, stuff like that. I would check in with the senior PASS, which was Tyson Estes, to see how things were going. Tyson would say, well, you know, he's struggles-- Justin struggles with some things, but we're moving along, it's fine. So, as long as Tyson was telling me everything was okay, I didn't really worry about Justin's work too much. It did take him a little bit longer than I would expect to process a lot of the paperwork, and I just attributed that to his lack of focus and tendency to ramble on, but over a time, over the course of these four years, Justin started bringing issues up in the office that really troubled him, that there was no real clear answer for. And oftentimes, when you would try and help him with these problems that he brought into the internal affairs office, he either wouldn't follow the advice you gave him or he would like, say, okay and only bring it up later, like, a month later, bring up the same issue again that you had already talked about and this became a repetitive thing. And so, some of the issues like

Workers'
Compensation Board
Hearings Division

there was an issue involving in-- the 2020 with the George Floyd protest going on around the nation. There was this thing that the fire bureau did in support of like, social justice where they put on this display with fireboats in the water-- in the river, the Willamette river and they were using the hoses on the fireboats to do some kind of display in support of social justice. This was a major issue for Justin. He came into the workplace. He came into the IA office talking about this, and it was kind of a puzzlement as to why it upset him so much. He-- when I talked to him about it, he said, well, you know, it's obvious, you know, in the '60s, they used firehoses on protestors, you know, and this is-- I can't believe the City of Portland would do this, and this is so offensive, and I'm-- well, I mean, I haven't heard anybody else with that take on it. I don't think anybody else made that connection, but okay, I get it, you're upset, like, you know, but we're not the fire bureau. I had no authority over them, like, whoever authorized that is of a higher rank than me. They work for a different bureau than me. It probably went through one of the city commissioners, like, I don't know how to help you with that particular complaint. It's not really related to what we do here, and I have no authority to do anything over it. I-- feel free to make a complaint to the fire bureau.

Q. Let me interrupt you for a second, Lieutenant. That particular issue that Mr. Callaway brought to you, it was-- in your opinion, was it related in any way to his work-- his job duties?

A. No, not at all and you know, when I say this, like, Justin didn't, like, come straight into the office and like, sit down with me and say, you know, I'm really upset about something I saw today, and I want to make a complaint. And his custom would be as he entered the office to kind of like-- his first thing to do, he would kind of like announce his presence with a sarcastic or awry kind of comment, and I think it

was meant in humor. And so, outside of my office door, I would hear him talk about certain things, and it would only be, like, after I heard him bring it up repeatedly that that would-- I would ask him, like, hey Justin, come into my office and sit down with me. I've heard you talk about this now several times and in my-- you know, I'm thinking in my mind, I can't really tell if this is-- if he's joking about this or serious about this or what, so let me get-- try and get to the bottom of it. Okay, so these fireboats, what were they doing? Okay, and why does that concern you? And, okay, do you understand that that's the fire bureau, like, we have no authority over them, and I can't do anything about that? Like, do you-- do you want-- you can make a complaint to the fire bureau. As I say this, I mean, I have to emphasize the fact that over time, Justin brought up this issue repeatedly of these fireboats. It was explained to him repeatedly; this is nothing that I have any influence over. Nobody, you know-- the police chief doesn't have influence over that, like-- and so, this is just one of many topics that was brought-- and each time that it would come up, Justin became more escalated at the fact that nothing was done about it.

Q. Can I turn your attention to Exhibit 16? What is the independent police review?

A. So, if you make a complaint against an officer, it can either go to internal affairs or the independent police review. The independent police review was created before I was hired with the City of Portland. What they created is an objective nonsworn civilian body to investigate complaints against police officers, like, sworn members, like your-your typical cop in blue uniform. I've called for service and-- or I got pulled over and I want to make a complaint because the officer had a bad attitude or didn't write a report or, you know, the officer used too much force when they arrested me. And so, the independent police review is-- it's not a part of the

Workers' Compensation Board Hearings Division

KONCZAL  -D-  -17-

police bureau. It's a part of the city-- it's a part of the city auditor's office or at least it was at one time and it was created for I guess-- I suppose because the public demanded like, another-another form of accountability, like, you know, I guess at the time, you know, they maybe did not trust members of the police bureau to investigate other members of the police bureau so the independent police review is a body made up of civilian investigators that is not employed by the police bureau and they're supposed to be more objective investigators, so to eliminate any bias a police bureau member may have in favor of or against another police bureau member.

Q. All right, thank you. Did you have an opportunity to review Exhibit 16?

A. I did read through most of it. I think I read through all of it, but yeah, I had-- I had an opportunity to review it.

Q. I want to turn your attention specifically to the portion where Mr. Callaway talks about-- I think on Page 1 is where the initial description is that he was-- that an inmate charged me and I thought I was going to die by suicide by cop.

A. Yeah. So, this is another incident that came up repeatedly and, each time it came up, Justin became more emotionally escalated and it would come up every few months over the course of a year or two. And each time he would become more upset and more emotional and more vocal, raise his voice and as with-- again, it's like kind of a theme. These things would often play out the same way. Justin would come into the office. The first thing he would do when he would open the door is he'd kind of blurt out some kind of loud, sarcastic comment about his experience on the way in to work. It could be some comment about one of the commissioners. It could be some comment about bike lanes that the city never, you know, put in that they were supposed to. It could be a comment about any number of things that he

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -18-

would make some loud, sarcastic comment about immediately upon entering the office. And this was no different, you know. He came into work one day and he kind of blurts out, well, I guess, you know, it wouldn't be-- you know, I guess you wouldn't be working in Portland if you weren't almost killed on your way into work or-- and it was this kind of general, like, kind of loud announcement that seemingly was supposed to be humorous. However, over the course of a day or two I heard him bring this up more and more and finally, I was-- I had to talk to him about it like, okay, you-- wait a minute, I'm sorry, like, you said you were attacked on your way into work? How did this happen? Like-- and to keep him on track I had to ask very precise step-by-step questions, like, very intentional to help Justin get to the point of the-the story. So, he tells me he's attacked on his way into work and this obviously concerns me. I'm thinking he was, like, physically assaulted. And I said, okay, what did-- what happened? And he said, well a guy charged at me on my way into work and I'm like, well, I mean, did he touch-- did he grab you? Like, how did you get away from him? Like, what happened? So, over the course of this conversation where I'm trying to get the details of this, I-I learn that Justin was coming in through the secure door on the Madison side of the Justice Center. This is a secure door. You need a Selectron (phonetic) to get in. Once it's closed, you know, it's locked unless you have a Selectron. He was coming into that door.

Q. And Lieutenant, I'm going to interrupt you again and point you to Exhibit 19, which is a map of that area.

A. Yes.

Q. Can you confirm whether the map looks accurate to you?

A. The map does look accurate to me, yes.

Q. Okay. Proceed with your-your testimony then.

**Workers' Compensation Board Hearings Division**

KONCZAL -D- -19-

A. So, I'm asking very specific questions like, okay, so did he put his hands on you? Like, did he punch you? Did you get into a fight with him, like-- and Justin said, well, no-no, he wasn't close enough to, like, actually touch me, but, you know, he was yelling at me, and he was-- he charged me. I'm like, well how far away was he from you? I mean, like, what did he yell? How far away? You know, I'm trying to get to the bottom of this because if you tell me you were attacked, I mean, I'm pretty concerned about that. And he says, well, I don't-- I don't know exactly how far he was away. I don't know exactly what he was saying, but, you know, he was yelling at me and I'm like, okay, so, you-you looked at him at some point? Like, if you saw him-- if he was yelling at you and you saw him, approximately, like, how far away was he? Like, was he a few inches away from you or was he, like, down the street from you? Was he in the street? Was he across the street? And it was at that time that I said across the street that Justin started nodding his head, like, well yeah, that was where the last place I saw him was, was in the intersection over by the park, kitty corner from the Justice Center. That park I know is Terry Schrunk Plaza. And I said, so, okay, so-- and you were you coming in the door? Like, did he have a knife or something? Was he armed? He said, well, I didn't-- I don't know if he was armed or not. I didn't see anything. And I said, so he was-- you know, so, just so I'm getting a good impression of what it is you're talking about here, like, he was like a good 60 feet away from you, maybe like 20 yards, 30 yards, something like that? Maybe 60 or 70 feet, am I correct? And Justin, like, nodded in approvement, like, yeah, yeah he was, I guess. You know, that was kind of Justin's answer, like, well, I guess. You know, I really wasn't looking at him, I was worried about getting into the building. And so, I said okay, so, did you get into the, like, was he close to getting in after you? You know, did-- as the door was closing, did he try and open it? And

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -20-

Justin said, well, I don't-- you know, I don't know. And I'm like, so, okay, I understand, like, this alarmed you. I understand that the presence of this guy screaming and yelling at you, like, alarmed you--

Q. Lieutenant, again I'm going to interrupt you, I want to point you to the map again. There are two stars-- two stars on the map. Can you tell me what the stars mean?

A. Yeah, so the green square that has a star in the corner, that-that green square is Terry Schrunk Plaza. That's the park. And that star is-- when I questioned Justin, like I said, very specific, very intentionally, when I questioned Justin that blue star is where I believed this person was that was yelling, that Justin saw that morning because I was very-- I tried to get down the details and the facts of what he was describing as an attack. And so, as I said, like, well was he-- Justin said, well, I didn't really look at him. You know, I was scared, I was trying to get in the building. I'm like, well, at some point you-you must've seen him, like, was he a few inches away from you or a few feet or was he down at the corner? Was he in the street? Was he across the street? And at some point, he said, yeah, yeah, he was over closer to the park by the intersection.

Q. And the other blue star by the Multnomah County Justice Center, the little square, what does that mean?

A. So, the Multnomah Justice-- the Multnomah County Justice Center, the Justice Center, that's where the central precinct is for the police. That's where headquarters is for the police and that's where the internal affairs offices are. The star that is on the Multnomah County Justice Center is the southside door. That is a secure door that you need a Selectron to get into. It's a pretty heavy door, you know, and it locks behind you upon entry.

Workers'
Compensation Board
Hearings Division

KONCZAL  -D-  -21-

Q. And based on your questioning of Mr. Callaway, is that where Mr. Callaway was at the time of this event?

A. Yes, and that-that blue star is where Justin was on the side of the building because that's where the door is. If you notice, the Justice Center itself is kind of shaped like a triangle within a box and on the back side of that, there's like, two squares. Like, one of those is a restaurant or it used to be a restaurant before 2020 and then, on that line there that separates the triangle from the square, that's where the door is. So, that's-- as I questioned Justin that morning to try and flush out, like, when you say attacked, like, what do you mean? Like, did, like, somebody assault you, like, they put their hands on-- like, are you okay? And as I got to the bottom of it, this is approximately how far apart they were from one another.

Q. Do you recall around when this may have taken place? Was it in 2021, does that sound right?

A. 2021 sounds about right. Again, it's-- you know it's been a few years now and my interactions with Justin were over the course of four years, so some of my memories of this kind of run together, but yeah, this was probably after the fireboats. This was probably like the next issue that he brought up an awful lot at work and again, you know, he didn't come in directly to my office and say, hey, you know, I want to-- I want to make a report, like, somebody attacked me outside. I-I overheard him bringing this up. Not in a very, like, serious tone, but he brought it up repeatedly until finally I had to kind of get to the bottom of it, like, hey, wait a minute. I keep hearing you say you were attacked, like, what do you mean? Like, what happened, like, tell me about this. Like I said, we had this conversation multiple times, so, yeah sometime in 2021. I thought it was closer to 2020, but it could've been early 2021.

Q. And is this part of your training to do investigations and to confirm facts as a

Workers' Compensation Board Hearings Division

police officer? Is this pretty much the -- is this in your wheelhouse?

A. Yes. Yeah, I-- yes.

Q. Do you have a recollection of Justin or Mr. Callaway's work hours?

A. Yeah. The professional staff which Justin was a nonsworn professional staff, typically worked about 7:00 or 8:00 to about 4:00 or 5:00 in the afternoon and-- because they fluctuated. There were three PASSes, and their hours would fluctuate based on workload because at-- a lot of times we were working from home. It would fluctuate based on that, but approximately between 7:00 or 8:00. Sometime some of them would start as late as 9:00 in the morning and they would usually be done; the office would close down by 5:00 p.m.

Q. And for Justin, though.

A. Justin, I think, normally started closer to 9:00. He liked to ride his bike into work in the morning, and we were pretty flexible with him coming in a little bit later because he had-- I think his son lived with him and he had issues with getting his son to school and so, we were just, I mean, really kind of low concern with this. Like, if Justin gets in a little bit later in the morning, it's not a big deal. If he comes into work on time, like, it's okay, like, as long as he's getting his work done and moving it along and at this point, we had already gotten kind of to the point where we knew some of his limitations and we felt his work was scaled down to something he should be able to accomplish. So, I wasn't too concerned about the exact time, but I do know that it changed, like-- and we were-- as a supervisor, I mean, we were flexible with that.

Q. Okay, thank you. Was-- did Mr. Callaway complain of any other incidents where he felt that his safety was in jeopardy?

A. Yeah, yes, there was another-- there were many incidents that he brought up.

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -23-

One of them was related to his bicycle and he came into my office-- I heard him again-- I heard him talking about this topic, just going around the office from cubicle to cubicle talking to different people about this and it had to do with his bike and his bike light. And at some point after hearing him talk about it for a week or whatever, two or three days a week or whatever it was, I called him into my office to say, hey, you've been bringing this up all week and you're bringing it up, like, increasingly I hear your tone and your voice, you're becoming much more serious about this and much more, like, aggravated by this incident, like-what-what happened? So, he explained to me that, like, you know, riding his bike to work is like one of-- one of the things he loves-- he liked about his job is that he has the opportunity to ride his bike into work. And so, his safety is very important to him because riding your bike in to work can be dangerous. So, he has a bike light and if somebody were to remove it, that's a threat against him, if somebody were to remove his bike light. So, he comes to me one day and he says, like, you know, my bike light was stolen, and I says, okay, you know, where was it stolen from and he said central precinct. And I said, okay, did-- do-- you know, did you see who did it? Did you see somebody take your bike light? And he said no, but that's the only place it could've been taken from. And so again, I-- okay, I need to ask very specific, detailed, intentional questions. When was the last time you saw your bike light? When did you notice it missing? And so, when I asked those two questions, there was like a full day that had passed from the last time he saw his bike light to the point in time that he noticed it missing and after questioning him, I told him, Justin, you're jumping-- you're making a large-- you're jumping to conclusions here to accuse somebody from central precinct of stealing your bike light. I used to ride my bike to work all the time. I-- bike lights came off all the time. I got flat tires all the time. Like, I used to ride my bike to work,

Workers' Compensation Board Hearings Division

KONCZAL -D- -24-

I'm familiar with these problems that it happens, you know. I can buy you another bike light. And-and I asked him, like, is-- was this-- you know, was this a fancy bike light? Did it-- was it-- did it cost-- was there some value in it? Like, why would somebody steal your bike light? And he says, no, you know, I bought it at a garage sale. It was used. I probably paid a couple of bucks for it. There's another person who rides a much, like, fancier bike than me who parks in the same spot as I park my bike and one day I had to move their bike, so I know that in retaliation they stole my bike light. And, on my way home from work that day, I got a flat tire and that is too big of a coincidence to lose my bike light and get a flat tire on the same day. So, somebody's sabotaging me and that affects my safety. I said, well, all right, I had to ask some more questions. So, you know, again, the last time you noticed your bike light you were at home. The next-- when you noticed it missing is when you were leaving work the following day. So, like a full 24 hours and then some had passed from the time he last saw his bike light, which was at his home, to when he noticed it missing, which was at work. And I-- so, I said, you know, you're kind of just blindly accusing somebody. Did you-- the person with the more expensive bike, why don't you just go to them and ask them about it, like, hey, did you touch my bike? He says, no, I don't want to do that because I'm very emotional about it and I don't want to confront them and it's not going to go well. I mean, yeah, but do you know-- do you know who it is? Do you know it's a sworn member who rides this other expensive bike? You're leaping to a conclusion to accuse this person-- you don't even know who owns this other bike and you're assuming, because you had to move their bike out of the way one day that they stole from you and he-- you don't-- I mean, you really don't know where your bike light went missing and so, he leaves and comes back and a couple of times and brings it up and finally, he comes back

Workers'
Compensation Board
Hearings Division

very angrily in my doorway and he says, you know, I want you to know that I'm the least paid member in this office and, you know, a $4.00 bike light may not be much to you, but, you know, I think the public would want to know if there's a cop in central precinct stealing. And I said, okay, all right, clearly you are lodging a complaint. I will take this complaint. This is a kind of summary of it. This stretched out over a little bit of time because I went back and forth, like, okay, well the first thing I would do is I would go see if I could get video of the hallway where you park your bike. I went down there and looked around. There's no cameras. There is a huge sign right where he parks his bike that says, no bike parking. There were no other bikes around that I saw, but I asked him when I came back. I said, are you talking about the space that says no bike parking? And he says, yeah. I said, well, it says no bike parking. I mean, not that, you know, you should lose your bike light or anything, but, like, it says no bike parking. Why are you parking your bike there? And he-- well, that's the only space there is for it and that's why I had to move the other guy's-- you know, the other guy's bike. So, I said, all right, I'm going to look for a video to see if there's a chance that we can locate video of somebody stealing your bike light. This became, you know, a can of worms trying to get the video and finally, you know, getting the video was going to cost hundreds of dollars. It was going to be billed to the internal affairs or the Portland Police Bureau because the county actually owns the cameras that captured anything relevant to this. There are no cameras where he parks his bike. So, there was no opportunity, like, even if it was stolen in the precinct, there would be no camera to capture the theft. So, you know, you don't-- you can't tell me exactly where it went-- where it went missing. There's no camera that would actually capture the theft if it did happen here. Like, so the only cameras that we've got are of the outside of the building and it's going to cost several

Workers'
Compensation Board
Hearings Division

hundred bucks to get those-- that video and we're talking about a $4.00 bike-- like, Justin, I will buy you a bike light. I will give you a bike light and ultimately, later on down the road I did give him a bike light. But he said it wasn't about that, you know, he said, you know, people-- I think people would want to know if there's a thief working in central precinct. So, I said, all right, I mean, you're making a wild accusation, but okay. This is going to be-- you've used pretty strong language here. You're actually accusing people working at central of being a thief. I'm going to send this to IPR. We are not to investigate this. This is your-- this is your complaint and to remain, you know, objective, this is going over to IPR and we're not going to meddle in this at all and IPR will investigate the theft of your bike light because you are accusing somebody working at central precinct of stealing your bike. Ultimately, what they found was the videos that were outside of the building, the evening before his bike light went missing, there is video of Justin leaving the Justice Center with his bike light attached to his bike. The following morning, there's video of Justin coming into the Justice Center with no bike light on his bike. This was in the IPR investigation. They paid for the video. They got the video, and it was clear from the very beginning, after talking to Justin about the flat tire, about the bicycle, that he lost his bike light somewhere along the way. He says he got a flat tire. He diverted to a bicycle shop. They took his bike. They fixed his tire. He got his bike back. I'm like, well, did you check with the bicycle shop because I know when I had to change a tire on my bike, I turned the bike upside down, the bike light always imbalances the bike because the bike light is affixed to the handles so the first thing I do is take off the bike light, then change the tire, then put the bike light back on. That's probably what happened at the bicycle shop. You might want to go back there and check with them. He told me he already did check with them. So, I was like, okay. All right,

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -27-

you know, we'll-- I'm going to type this up as a formal complaint and I'm going to send this over to IPR. I said, but, you know, you have to be careful about just making accusations of theft against people you don't even know. You have no proof of this. You're making an assumption here, but okay. It's-- this is going to be a formal investigation and we're not going to be a part of it. So, that was investigated and this was like a lot of the other problems that he complained about, except for this one resolved more quickly because this was something that he was actually complaining about that I had some authority to actually do something about. Most of his other complaints were things that I had no authority to influence or change in any way. This thing with the fireboats, I don't know what to tell you about that. I can't do anything about that.

Q. Lieutenant, I want to actually go back to your testimony about the incident where Mr. Callaway told you he had been yelled at by an individual. In the IPR transcript, Mr. Callaway-- and I'm looking at-- starting at Page 5--

A. Okay.

Q. --he names an individual which he says was the person that he encountered. This individual's name was Randy Graves. Did he-- when you were talking with Mr. Callaway about the-- this incident over the multiple times you talked with him, did he-- was he ever able to identify the person?

A. Well, when I first talked to Justin about it, Justin had no idea who the guy was. When I asked him specifics about, well, like, was he carrying a knife? Was-- did he make a fist? Like, was he running at you? You know, he was like, I don't-- you know, I don't know. I didn't spend a lot of time looking at him, I was trying to get into the building. And so, you know, I told him, like, well, I'm not really hearing much here. Like, this is, you know, there are homeless people in Portland. There's a

Workers'
Compensation Board
Hearings Division

mental health crisis. This is, you know, I mean, I'm not trying to undermine this, but it's pretty common to-- I mean, you live in Portland. I live in Portland. Like, this is-- this is pretty common to see houseless or mentally ill or drug affected people like yelling in the street. This happens and you have to-- you know, it doesn't sound like he really got close enough to you to actually, like, ever attack you or even touch you. So, there's not much that can be done and you can make a report about it if you want, you know, but there's not much that can be done about it. If you want, you can make an online report or you can go down to central precinct and, you know, get an officer to, you know, take a report for you, but there's not really a crime here in my opinion, like nothing that will ever be prosecuted. And so, at some point down the road, Justin started to develop a habit of looking at the fliers that officers would put out. They were wanted fliers and suspect fliers like, a BOLO, like a be on the lookout like they used to say in the old cop shows. There's a BOLO. Like now it's called dragnet. There's like, you put out a dragnet flier for a suspect. Like, I have a picture of this guy, can anybody ID him or there is a picture of a guy who's already known, and he has a warrant for his arrest, and I need somebody to go pick him up. At some point in time, Justin sees a dragnet flier of this man named Randy Graves and he comes to me, and he tells me that this is the guy who attacked him, and I said, you know, I said, well, Justin, I mean, we talked about this. Like, he didn't-- he didn't-- there was no contact between you and him. There was no physical contact between you and him. And Justin said, well, he looked up like a city code that's called offensive physical contact and offensive physical contact in the-- under city is code-- the ironic thing is it doesn't actually require contact, it just requires that you be placed in a reasonable, like, you're in a reasonable fear and I said, yeah, okay. There-- that is a city code. It's a misdemeanor. Jail is not booking on

Workers' Compensation Board Hearings Division

KONCZAL -D- -29-

misdemeanors and it's still a-- it's still quite a stretch. You know, like, the fear that you're placed in has to be reasonable and this guy, you're telling me, was on the other side of the intersection as you were entering a secure facility. Like, you know, you can feel free to go ask an officer to take that report or you can do it online. The thing about online reporting is, you can't file an online report if you have an actual suspect. If you have an actual suspect, it's required that you have an officer actually take that report because there could be followup to do. So, at some point in time, a few days later or a few weeks later or whatever, Justin becomes convinced he sees this guy, Randy Graves, on a dragnet flier and he becomes convinced this is the same man who threatened him. And, I was-- you know, I had to question this. Like, well, you know, when I talked to you previously and I asked you, like, what did he look like? Was he holding anything? Did he have a knife? What was he wearing? You were like, you know, I don't--, like, I didn't spend any time looking at him. I was scared. I was trying to get into the building. But now, you're telling me that this flier is definitely Randy Graves and so, have you made a report yet? No, I haven't made a report yet. Okay, well, you can-- you know, you can do that and when the officer takes your report, you can tell him you think it's Randy Graves, you know, that this looks similar. And so, Justin looked into Randy Graves. He looked into, like his history, some of the things he had been charged with. He looked at the flier itself and it turns out Randy Graves is a pretty volatile person who has done some violent stuff, and he is homeless, and he is mentally ill. And so, Justin kind of compounded Randy Graves' criminal history with being yelled at this morning and it escalated it for Justin. In Justin's mind, now he wasn't being yelled at by a homeless person. No, he was being attacked by Randy Graves who has stabbed people in the past and attacked park rangers and all this other stuff. And so, the story kind of morphed

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -30-

over time and it's like, okay, that's fine if you think it's Randy Graves, when you make your report with the officer, tell him you think that's the case, but don't be surprised if this never, like-- I don't think you're ever going to hear anything back. I don't think a prosecutor's going to call you on this one, like, there's-there's not a lot there to go on to prosecute for a crime, but feel free to make a report if you want.

Q. Lieutenant, was it part of Mr. Callaway's job duties to be reading these dragnets or-- when during the day would he have been doing his own personal investigation into this?

A. It just became-- him reviewing the dragnet fliers became a habit of his. He would go through them. I would see him doing that a lot. Like I said, we had scaled back his work to something that was manageable for him. At one point, I encouraged Justin to learn some of the tasks that the other PASSes knew, the senior PASS, I said, hey Justin, this would help you if you learned some other skills. If they were to ever be sick or not be able to work, like, it'd be helpful to have somebody else in the office who knew these other skills and Justin told me flat out, hey, I didn't apply for a senior PASS position. I don't want that job. I know my limitations. I applied for this position because this is something that I can cope with. This is something that I can deal with. I didn't-- I don't want to learn his job because I don't want to do his job. And I said, oh, okay, all right. So, we had scaled back-- I mean, Justin was honest about that. So, we had scaled down his work to very minimal expectations, but one of those expectations was processing the SIs, the supervisory investigations. These were these lower priority cases. We would give those to Justin. If-- there are timelines to everything we do. You have, I think, seven days for the administrative person to get the SI to the sergeant. This is something that should take about a half hour at most, but we have-- there are timelines, and

you can use up to seven days. You-- nobody needs seven days to do this, but I was regularly getting my SIs to me on the seventh day which means that now I have to, you know, put aside what I'm doing because this is now the last day on this timeline. I have to put assigned what I'm doing and go through this really quickly and get it assigned really quickly, and I would ask him, like Justin, this shouldn't be taking you seven days. I mean, I'm surprised it would be taking you two or three days. This is something that we can do in about 15 minutes. But Justin would oftentimes dig into the SI. He would start looking into the background of the person who made the complaint, see what other complaints they had made in the past, look at what kind of police report they filed. I would tell him, like, dude, you don't need to do this. Don't do any of that, it's going to be investigated by a supervisor. They will do that stuff. You don't need to do any of that. This shouldn't be taking seven days. We've got to move these on a little faster. So, I started to notice when he wasn't doing his work and oftentimes, he would be reviewing dragnet fliers and oftentimes I felt that as Justin struggled with his administrative duties, he magnified these other events and other things that were going on. So, he would get involved in these dragnet fliers and start looking. Like, one time there was a car reported on a dragnet flier that had been stolen. It was an antique, collectable car. And very obviously to me as somebody with police experience and training and everything, this is not a typical car that gets stolen, right? I told Justin, like, hey-- he saw the car on the way home. He saw where it was. And I told him, like, you know, there's nothing you need to do except for notify the person who put out the dragnet flyer. Just-- the officer or whoever it was who put out the dragnet flyer, call them and tell them you saw the car on the way home and leave it alone. Like, I need you to get back to work. I need you to work on these SIs and I would always see him looking through these dragnet

fliers. And so, he started to-- when I say he started to do things like not related to work, but he tried-- he started to do things that created more work for the office that was not related to office work. And like the stolen car, the dragnet fliers, things-- I don't know if he thinks he was being helpful or what, but like one time he saw, like, a hit and run or some kind of car accident on the way into work and he picked up, I think it was like the license plate or the bumper to this car, like, some piece of this car that fell off in the accident. Like, he brought this into the internal affairs office, and he gave it to an internal affairs sergeant and now that sergeant is dealing with this hit and run Justin-- I mean, the appropriate thing to do would either have been stay by and talk to the police as a witness, leave a note, I don't know, report it. Call 911. But, you don't bring, you know, bring a bumper or a license plate into the internal affairs office. Now, Sergeant Koppang (phonetic) had to set aside his work and deal with putting this thing into evidence for a scene he was never at for an accident he knows nothing about, and this started to become just more of a problem. Like, Justin not being able to focus on his job, but focusing on just about everything else, and creating more work than he was actually getting done.

Q. Would you say, Lieutenant, that a lot of Justin's actions and complaints were conflating, for instance, PPB's law enforcement functions with this--

MS. PHILLIPS POLICH: I'm going to object that that's leading.

THE ALJ: Okay. Ms. Vu, do you agree?

MS. VU: Yes, I can rephrase.

THE ALJ: Okay, thank you.

Q. Yes. Do you find that some of these complaints and actions, how would you describe their relationship to PPB's functions as an employer versus it's function as a law enforcement agency?

A. Yeah, I mean, there's certainly a difference there, right? There's-there's a distinction there. As an employer, you know, you have to, you know, take care-- you've got to take care of your employees. You know, your employees have rights. They have worker's rights. They have-- they're in a union. You have to know their contract and you have to know, like, how much sick time they have and what kind of benefits they have, like vacation time, all those kinds of things, and there are rules that regulate that. And then, there is the police work that we do. As a law enforcement agency, sworn officers going out and, for example, responding to a hit and run. The appropriate thing to have done if you witness a hit and run is call 911 and either ask the officer to call you back so you can give them your statement or stand by and wait for the officer and tell them, like, I witnessed this hit and run and the license plate is over there and, you know, the internal affairs office, our function is to investigate complaints of misconduct against sworn police officers. So, we should not be getting involved in law enforcement because we are investigating law enforcement officers. It's a very distinct and different job. And so, yeah, you know, Justin would oftentimes allege that rules aren't being followed. He would like allude to this. Well, the rules aren't being applied fairly and yeah, there was-- there was a distinction between him-- like, he couldn't understand, like, why that was inappropriate to bring into the internal affairs office. Like, that's not a function-- there's a process in place for that and it involves calling 911 or nonemergency or talking to a police officer who's going to go out and respond to that call. It's not appropriate to drag that into the internal affairs office and have a sergeant, you know, put that into property.

Q. Thank you for that clarification. I want to turn to the spring of 2023. My understanding from Mr. Callaway's-- the transcript of Mr. Callaway's statement to

Workers'
Compensation Board
Hearings Division

IPR that he went on medical leave at that time. Can you describe what was happening during that time?

A. Yeah, so the way I would-- the way I remember it and the way I would characterize it is I became-- probably in my estimation, I don't know if Justin feels the same way, I became one of the closer people to Justin in the office. Again, raising a daughter who is on the spectrum, I did want Justin to feel welcome. Oftentimes when I would see him doing things that were making people uncomfortable, I would try and interject in some way, like, hey Justin, I need to talk to you or something like that. And I did really want to help him as best as I could, so I got to know him even outside of work. I met up with him, like, a couple of times. You know, I offered to teach his son boxing because I'm into boxing and I had this gym set up in my garage. He brought his son over to my house and I gave him some boxing lessons because he told me his son was into that. I met up with him for lunch a couple of times and I would say, over time Justin's affinity to talk a lot for hours at a time had turned off, that's-- yeah, had turned off a lot of people from him. Like, they weren't rude to him. They weren't mean to him, but they didn't-- they knew that just, you know, talking to him could turn into an hours long conversation, rehashing, you know, fireboats and the homeless guy and the bike light and all this stuff and people were tired of hearing about it, and they had work to do. So, during this time, I continued to make myself available to Justin. In getting to know him personally, I think he started to confide in me quite a bit more and come to me with more complaints than the other supervisors because I think I was the most responsive to him even though I didn't-- regardless of what I thought of the credibility of his complaints, I wanted him to feel like a whole employee and I wanted him to feel like he was supported. So, I did make an effort to get to know him a little bit

Workers' Compensation Board Hearings Division

KONCZAL -D- -35-

better and I do feel that I tried the best that I could.  At some point, I remember there was a big change in his personality, and the affable, talkative, Justin Callaway became a very, like sullen, a little bit withdrawn, kind of, I'm just going to characterize it as moping around the office like, looking-- very much looking like his feelings were hurt, but not really talking to people the way he used to.  I know he spent a lot of time talking to one of the other PASSes.  He developed a friendship with Ms. Meredith Watkins, and he would often talk to her and so I would check in, like, hey, how is Justin doing and she didn't ever really give me details of their personal conversations, but she would say things like, well, I'm worried about him, or you know, I think he's--

MS. PHILLIPS POLICH:  I'm going to object that that's hearsay.

THE ALJ:  I agree.  I--

MS. PHILLIPS POLICH:  (Unintelligible) Meredith is going to be testifying.

THE ALJ:  -- I agree that we don't need to know what she was saying, so, could you be-- redirect the question?

Q.  Sure.  What was your understanding after speaking with Meredith about what-what-- about her knowledge about what Justin or Mr. Callaway was going through?

A.  That he was unhappy at work and that he was--

MS. PHILLIPS POLICH:  Okay, I'm still going to object that this is hearsay if he heard this from somebody else.

MS. VU:  This is the lieutenant's understanding based on his conversation.

THE ALJ:  I will allow the answer to it, but I agree that I'm not going to

Workers'
Compensation Board
Hearings Division

put too much weight on it.  So, go ahead.

Q.  All right, we can move on.

A.  Yeah, I was-- I have more to add to the question.

Q.  Yes, please, please do.

A.  Okay, so the thing that I think-- I don't know, the thing that I remember as being kind of the tipping point from him being, like, still being talkative and friendly and everything to him kind of going over the edge, like I said, he began to confide in me quite a bit more and I think he came to me more directly and viewed me as more of a friend than some of the other employees in the office.  This was the impression that I got.  And so, one day, I was very busy.  I had meetings.  I had just enough time to go have lunch and do my wellness hour and then come back, change into my, like, work clothes and jump into this meeting and so, I was under quite a bit of a time crunch.  There was a little pressure.  So, while I'm in my office changing my clothes from my workout clothes to my business attire, I have a meeting that's beginning in a couple of minutes, my phone is ringing and Justin comes over to the door and he's like pulling on the handle and I tell him, hey wait a minute, no, I'm changing.  I'm changing my clothes, like, not now, wait a minute.  He's standing outside my door, and he starts talking, like, you know, somebody's downstairs for you.  I have to go get them and do you want me to bring them up here or what?  And my phone is ringing.  I've got this meeting.  I'm half naked because I'm changing my clothes and I'm like, I just said, hey man, not now, give me just a minute.  Give me a minute.  I'm busy right now.  Give me a minute and I could see his silhouette, like his outline outside the door and he's still tugging on the handle, and I don't know if he can't hear me or he's ignoring me or what's going on, but like, I said it several times.  So, finally, I raised my voice, I said, give me a minute.  And I raised my voice enough

Workers' Compensation Board Hearings Division

KONCZAL  -D-  -37-

that this-- he finally stopped pulling on the door handle and I could-- again, I have a window to my office. There's this kind of blurry covering over it so you can't see clearly but you can make out like, outlines of people and stuff. So, I could see his outline, like, he just stood there in my doorway, like, with his head hanging, like he had-- like-- his response to me raising my voice was very childlike and he stood there. It was like he had been scolded. And another supervisor finally came out and said, he Justin just go back to your seat. Sergeant Konczal told you give him a minute, like, just give him a minute. He'll be out in a minute, go back to your seat. And this was kind of the turning point, like, I don't know if this is the thing that caused it or if these two things just lined up but after this incident, Justin became much more withdrawn, much more-- he didn't have very-- he wasn't as affable, friendly or outgoing and he became more hyper focused on these other events that had happened.

Q. You kind of-- to set-- to clarify some of what was happening at that moment, do you know who was on the phone? Who was ringing through?

A. I don't remember. I remember it was somebody from command. I remember it was somebody who was of a much higher rank than me, like a captain or a commander. There was an IPR interview that was scheduled to begin, although IPR conducts the interviews, IA coordinates them, and an IA sergeant has to be present in them. So, the IPR interview was beginning in a few minutes. Somebody was on the phone. Somebody was-- I think one of the people, like I had a phone call going on and then I had another, like, a call waiting and it was the person downstairs who needed to come upstairs and, you know, then Justin's tugging on my door and everything and I'm telling him, like, give me a minute, I'm changing, like, I'm half-- I don't want to say, like, I'm half naked, but I'm just like, don't open the door right now,

Workers'
Compensation Board
Hearings Division

please. Like, give me a minute.

Q. And you were speaking through the door. Is it fair to say that you weren't sure whether he could actually hear you?

A. Yeah, I'd done-- I thought he could hear me was but, like, just ignoring me, but I don't know because he-- I think he is partially deaf in one ear and then the door was closed, so, I didn't know if he couldn't hear me or if he just wasn't listening. I don't know which one it was.

Q. And then you said that after this incident, you noticed his demeanor change. Can you talk more about that?

A. Yeah, that's-- I mean, a lot of was like I said, he was not-- he was not talking like he used to and like I said, his talking was incessant. So, very suddenly he became withdrawn, like, he wasn't-- he would really only talk to Meredith Watkins. He stopped coming to me. He stopped, like, chitchatting with me. Yeah, he would just sit at his desk, and he would mope around. He wouldn't talk. Like, for example, for example, Justin brought in a massive package of gum that he made available to the office. And he offered it to everybody who came into the office. Here, have some gum. Have some gum. After I raised my voice at him, you know, he took this massive box of gum off of his desk and he took it home or he put it in his locker or something, but, like, he made it known his feelings were hurt to the point that he was not going to share his gum anymore, right? And so, things like that. One of the things that he brought into the office was one morning he saw somebody-- on his way in to work, he saw somebody throw a rock at somebody else. He picked up this rock. He brought it into work. I don't know what he wanted us to do with it, but he took a magic marker, and he wrote something on the rock, like the date and time that, like, he picked up this rock. He wrote something on it my magic marker and he

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -39-

set it like on top of his desk next to this gum. And he took this thing, you know, this was something, you know-- he took this thing off his desk, too, like, to use a phrase like, I'm going to take my ball and go home, right, because you yelled at me is kind of the impression that I got from him. So, in addition to, like, not talking as much, he was now, like, making it known, like, I'm not going to-- like, it does sound childish and I-- it looked childish to me, but it was very intentional, like, I'm no longer going to share my gum with you because you yelled at me.

Q. And were your-- did you make any efforts to address with Justin some of his concerns and why the change in his behavior?

A. Yes. At one point, you know, after this went on for a couple of weeks-- I don't know exactly how long it went on for-- but you know, everybody noticed, like, hey, Justin is not talking to everybody anymore, which as far as his productivity goes, that was like, good. That helped his-- him get his work done, but it was an obvious change in his behavior. And so, at some point, like, knowing that now he's only speaking to Meredith and knowing that he's been fixated on all these different events and knowing that there's been this change in his mood, I talked to Sergeant Erik Koppang's and I said, all right, I'm going to get a pad of paper, I'm going to get a pen and I'm going to talk to Justin. I'm going to go step by step and figure out what it is that we're missing here, like-- and explain to him, like, why-- like, I can't do anything about this issue, what he can do about that issue. If this issue is something that is, you know, he needs to go to EAP for, like, I'm going to-- we're going to go through this, like, one-- step by step and figure out, like, is there anything actually actionable as his supervisor I can help him with. So, I asked Justin to meet with me in Sergeant Koppang's office and one by one we went through each of his complaints and concerns and ultimately, you know, the -- there really wasn't much we could do.

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -40-

The bike light thing was investigated thoroughly. He could make a complaint-- or not a complaint, but he could file a report about Randy Graves. He could go do that. He could go down to central precinct and get a police officer to file a report, and I don't know why he didn't, but he never did, and he was told that that's an option. I think his expectation was that Sergeant Koppang or I would stop what we were doing, and we would write the report for him. That's-- no, there's a process. Like, you go down to the precinct, and you have a police officer file that report. So, one by one we went through these things, and I just didn't see what I could do to help him with these issues that he brought up repeatedly that were the reason for his unhappiness apparently.

Q. Okay. Did Mr. Callaway display any hostility towards you personally?

A. Yeah, he actually got angry-- I wouldn't say that he got angry at me, but he got very elevated one day and it actually surprised me because I intentionally went to Justin on this particular day to just check in with him and give him positive feedback. Like, he looked down. Like I said, he was sullen, withdrawn. He was moping around the office. I wanted to have this conversation with him about all these different complaints to show that we-- I am concerned about it. I don't have the answer for some of these things that you're complaining about. They're not anything I have any control over. So, I thought, you know, they had just done-- all the PASSes had just processed a number of SIs. These SIs were more like templates. They went out for-- I can't remember, it was pretty minor violation of policy that these SIs went out for because there was a misunderstanding of the directive. I don't know, but a lot of officers, like, failed in this portion of the directive. So, like, 40 supervisory investigations went out at once. Supervisory investigation is an SI. Normally, these are the things that Justin would-- were primarily the things he

Workers'
Compensation Board
Hearings Division

would process. Because there were so many of them, all of the PASSes kind of chipped in and did their portion but there was a lot of SIs and I called him into the office specifically to thank him for his work on that, like Justin that was a lot of work, you know, I know it was tedious. I know it seemed very, like-- yeah, very tedious, repetitive, just a massive volume of work, but I appreciate you being a team player and helping out Meredith and Tyson in processing all of these SIs. That was great teamwork, you know, just keep it up. You know, anything I can help you with, you know, you let me know. I just-- I wanted to tell him something positive and like, let's kind of change this a little bit, like, there's nothing really going on in this office. People are generally pretty quiet, just doing paperwork. Like, it shouldn't-- you know, I don't know why this is affecting you so much, like, you know, let's change the tone around here and I'm going to give you some positive feedback. So, as soon as I'm done telling-- like, immediately upon telling him, you did a good job and I'm-- you know, keep up the good work, like, let-- that-that's the way, you know. As soon as I'm done talking, you know, he yells at me. He's like, I have had it. I have had it up to here and he raised his hand over his head, and I was like, very shocked by that, because he was yelling. And this was like the end of the day. This was pretty close to the end of the day I remember. And so, okay, wait a minute. I'm-- all right, what is it that you've had it with? Like, what do you mean by that, you've had it? And he regurgitated everything that he had already talked about, that we had already talked about for years now. You know, the fireboats, the-- Randy Graves, you know, the bike, you know. Not being treated-- he didn't think he was being treated fairly because I-I-- you know, he wasn't-- he kept asking for an accommodation at work, but he couldn't tell me for, like, what. You know, at one point, he alluded to his autism. At one point, he alluded to his ADHD or ADD or

something and I'm like, okay. What-- how can I accommodate you? And he couldn't really say how-- what accommodation he needed and this morphed over-- at first, he needed an accommodation for his autism and then, like, it was for his ADD and then it changed to PTSD. I need an accommodation for my PTSD. It was-- okay, how can I accommodate-- and he was trying to correlate this accommodation to this guy outside the Justice Center who was yelling at him and may have caused him to be afraid and I just-- I didn't understand how these two things related. I didn't understand, like, what accommodation can I give you, you know, and I directed him to-- at different points in time, I directed him to different people who knew about EAP because I just felt like these are problems I can't help him with.

Q. And just to interrupt you, EAP, do you know what that stands for?

A. Yeah, it's the employee assistance program which is to my-- I don't know much about it, but I know it's a number of, like, different-- I don't know how to say it, like, therapies and it's just help for an employee. If you're going through a divorce, like, you can talk to a divorce attorney, you know, if you're having addiction issues, you can go to talk to an addiction therapist. It's, you know, it's not necessarily a part of the bureau, but they are services offered for your wellness as an employee. Now, the EAP people who work for the bureau, my understanding is that they're pretty well versed in these services that are offered. So, you go to one of these EAP people and you tell them, like, whatever your problems are, and they put you in touch with the correct services. So, at times, I suggested to him to go to this person or that person. One person I suggested he go to was Amanda McMillan because she was-- she had worked different ranks in the internal affairs office and she was an EAP person, so she knew the services, but on this particular day, I mean, this was like beyond that. This was like, I-- this day that I told him you're doing good, and he

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -43-

responded by saying, you know, I've had it. I'm done with this place. You know, I don't want to keep working in this office anymore, I'm done. And I just thought that was-- I wasn't hearing what it was specifically that made him, like, "done with this place." Like, he's had it up to here [indicating] and raising his hand above his head. And I think it was a day or two after that-- I think it was the very next day was the first time he had taken FMLA previously, like, intermittently, here and there he had taken it. He worked on, like, kind of a hybrid schedule some days. He was on FMLA leave. Some days he was in the office. But after this conversation, like, the very next day he-he went off on FMLA and I didn't see him for a couple of months after that.

Q. And then, just to clarify, Mr. Callaway-- did he have the ability to work from home or remotely at any point during his employment?

A. Yeah. So, everybody was given the option to work from home initially at the beginning of the COVID pandemic. You know, everybody was kind of overwhelmed with how to respond to that. And we're all waiting direction-- for direction from the chief or the city or whoever. And so, the IA office was like kind of up in arms at the time, like, well, I mean, we're not sworn police officers. We're not responding to emergencies so we're not essential, we should be able to work from home, and we needed direction on that. And I thought we were essential. The city made it clear that if you're a sworn police officer, you're essential and then they looked at some of the nonsworn people and made determinations if they were essential or not and who could work from home. Ultimately, everybody in our office was given the permission to work from home like everybody else in the city. The hurdle was-- the biggest hurdle was providing people with the equipment to work from home. Like, nobody was prepared for a pandemic and so our lieutenant and captain at the time, Chris

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -44-

Gjovik and Cliff Bacigalupi and the commander, Bryan Parman, they were hustling to get us laptops and computers and things like that so we could work from home. As they came in, they trickled in-- this equipment trickled in one by one, little by little, and we figured, like, the best way at the time to allow people to work from home were people who were higher risk. They were saying at the time if you're overweight, you're higher risk. If you've got asthma, you're higher risk. If you're a diabetic, you're higher risk. If-- you know, all these things. Well, you know, one person in the office was-- met some of those requirements, so they were the first one to get the ability to work remotely. When the first computer came in, that went to that person. A number of people thought that this was unfair. Like, a number of people felt that they should be the first one to be able to work from home. There wasn't-- I felt that the decision that was made by command, which was to give the equipment to the higher risk people first, I thought that made sense. We only knew people were higher risk if they told us. This is their personal information. They do not have to tell us. One of the investigators was upset that he didn't get the option to work from home and he wanted to know why the other person did and when we explained that they were high risk, he said, well, I'm high risk. Well, how do I-- you never divulged that to me before. Like, okay, so the next computer that comes in will be-- you know, we'll give it to you. So, we were struggling to do the best we could. Nobody had the answers, and nobody was really sure what this was going to look like, how it was going to play out. But everybody eventually had the opportunity to work from home and when Justin had the opportunity to work from home, you know, many months into this thing, when he finally had a computer and everything to work from home, he would often show up to work and we would tell him, you can work from home and he would say he enjoys the process of coming into work. He'd

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -45-

rather be at work and there are some things he can't get done from home and it was like, okay, well, I mean, it's up to you if you want to be here you can be here, but you can work from home. And a lot of people just kind of we-we didn't see for months on end, but most people work some kind of hybrid schedule where they were in the office some days and then working from home other days and I know Justin preferred to be in the office and he was given the opportunity. In fact, he was encouraged to work from home.

Q. Did Justin ever relate to you any of the issues or any information about what was going on in his own personal life specifically around the time when he took medical leave?

A. He told me- I mean, he-- like I said, I got to know him probably better than most of the other people in the office and so he would share with me some of his struggles and when he first-- I think he came back from one of his intermittent FMLA leaves and he came back and he-he told me he had-- you know, he was diagnosed with autism and another time he told me he had ADD and so, we would talk about this. At times he would talk about his children and his relationship with them and his relationship with his ex-wife and that was kind of a struggle. He didn't have the best relationship with his ex-wife, and I think his daughter, he said, had some of the same qualities of the way she would talk to him in, like, a condescending way or something like that, was kind of abusive towards him, verbally abusive towards him. And so, he had his son living at home with him who is going through some troubles just like, it seemed to me, like, adjusting to adolescence and teenage years and stuff like that. I got to meet his son once when we were doing this boxing thing. But he told me-- I think he said that his daughter had to come home and stay with him for a little while and so he had to take FMLA leave for that because he's like a single father and he

Workers'
Compensation Board
Hearings Division

has, you know, children who have needs that he's trying to accommodate so he needed FMLA for that.

Q. What happened when Mr. Callaway came back from medical leave?

MS. PHILLIPS POLICH: This is Jodie, could-- we'd kind of like to take a break on this end just to use the facilities.

THE ALJ: Okay.

MS. PHILLIPS POLICH: Is this an okay place to pause or are you almost done, Linh.

MS. VU: I am actually-- we're actually almost done. I've got just a few more questions, Jodie, but--

MS. PHILLIPS POLICH: Okay.

MS. VU: -- I'm happy. I would say, like, half an hour, is that too long?

THE ALJ: Let--

MS. PHILLIPS POLICH: Yeah.

THE ALJ: Why don't we--

MS. PHILLIPS POLICH: That would be too long.

THE ALJ: -- why don't we just take a moment and let's reconvene in five minutes. Stay on the line and we'll use the restrooms.

MS. VU: Great, thank you.

MS. PHILLIPS POLICH: Okay. Sounds good.

(Off the record)

THE ALJ: Okay, we are back on the record. Go ahead, please.

MS. VU: Thank you.

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -47-

Q. Lieutenant, what happened-- can you describe what happened when Mr. Callaway came back from medical leave?

A. Yeah, so when he was out on medical leave-- and I think he was out for a couple of months-- and--

Q. So, this would be now July-ish 2023?

A. Yes. Yeah. So, he comes back from medical leave, and I was hoping that he would come back with a different perspective, like, a fresh start sort of a thing like the time off would be good for him. He's on FMLA. He's at home, you know. Hopefully he'll have a new perspective with a better attitude at work and-- but I was made aware that while he was on FMLA, he had shown up at different city offices and he had had some outbursts, which the employees were alarmed because when he-he would talk about these topics, the same ones that I've already talked about, he would talk about these with everybody in personnel or human resources and he'd get emotional about it and his voice would become very elevated and it was like he was yelling at you. And so, I was getting reports that this is what he was spending his time doing while he was on FMLA. And then when he came back to work, you know, months later, he came into the office and it was, you know-- I think he worked in the office the first day he didn't really say much to anybody. I think he came to my office, and he said, you know, I'm back, and just to let you know, I didn't want to come back here. I'm done with this place. And that was disappointing to hear, like, you've been off for two months, you come back and this is, like, the first thing you say to me. I was like, okay. All right, well, you've got to work with the city if you don't want to work in this office anymore. You've got to work with them to find something else and I think I had a conversation with him, like, you know, I do remember encouraging you to try and learn some of the other skills that are going on

Workers' Compensation Board Hearings Division

in the office, like Tyson and Meredith do. That would make you a candidate for some other positions in the city. And you know, you didn't want to do that, but if you don't want to be in this office, I mean, you're going to have to work with the city to find some other position for you. And so, that was like, kind of, the only thing that was said on the first-first day. I think the second day, he-he came-- he was back in the office. I want to get this-- I want to get this straight because I think he came in-- he came into work a little bit later than what his time on the UGAR (phonetic) was, which again was not a huge concern of mine but after being in the office for--

Q. What is the UGAR?

A. These are schedules, like the work schedule.

Q. Okay.

A. It shows everybody's start and stop times. And so, after being in the office for a few hours, he told me he was going to work from home for the rest of the day. And I told him, like, you know, you have the option of working from home. We've encouraged you to work from home, but-- however, you don't-- like, you just don't make it up as you go along, like, you have-- you know, you have to get supervisor approval for the days you're going to be-- because we had now gone to a schedule where it was like set days, like, this is your day in the office. This is your day at home. This is your day in the office. So, you know, you have to-- you don't just tell me you're working from home. You have to request it. You know, you have your set days that you work from home. This really upset him, being told no. Normally, I wouldn't-- I didn't tell him no. I tried-- I did handle him with kid gloves, but I saw at some point, like, everybody needed to be-- like, the rules had to be applied equally here, and this was a contentious thing with city employees returning to the office and it wasn't a popular topic. And work needed to get done, so I told him, you know, you

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -49-

came in late as it is. You know, I need you to get some work done and like not-- you just came back from two months off. You've got to-- you know, no. So, he comes back to my door, and he says, well, I'm adjusting. I started work at 5:00 a.m. this morning. And it was like kind of the same conversation, like, I mean, that's-- we adjust all the time, but you get preauthorization to do that. Like, you talk to your supervisor like, hey, tomorrow I've got to start at 5:00 a.m. because I've got this interview. You don't just, you know, make up your hours as you go along and then tell me about it later. So, he says, well, wait a minute, if you're-- so, what he's saying is he adjusted. He started work at 5:00 a.m. So, he started early, therefore, he's going to go home early. That's what he's saying to me and I'm like, well, wait a minute. You don't work at 5:00 a.m. And he says, well, you know, I checked my email at 5:00 a.m., you know and I'm like, well, I mean, why did you do that? He said, well, I couldn't sleep. And I said, so you got up at 5:00 a.m., you couldn't sleep, and you checked your email and-- but, like, nobody made you check your email at 5:00 a.m., you just decided to do that? Yeah, yeah, I just decided to do that. Okay, well, you know, all the people we work with, you know, they start around 8:00 or 9:00, like, IPR, the people we interview, like, all this stuff, like, what-what did you do at 5:00 a.m. if you were working from home? Well, you know, and he got very upset with me for digging into this, like, but if you're telling me you started four hours, five hours ago, whatever, you know, what did you do for all that time? And at first he told me, he sent an email and then later on he told me that he-- it failed to send, so he didn't actually send an email. He told me he sent an email, then he told me it didn't send. So, I'm like, so in like four hours or whatever it was from 5:00 a.m. this morning, you wrote an email that you didn't send and that you're telling me that's what you did for three hours? He says, well no, I also went to physical therapy. He

Workers'
Compensation Board
Hearings Division

went to physical therapy for an accident he got into on his bike while he was off duty. He was off duty on his personal time. He got into some kind of accident on his bike, and he tells me that he went to therapy that morning. I'm like, if it's something that happened on your-- you injured yourself on your personal time and you're going to therapy for it, that is not work. Like, you weren't working at 5 a.m. I mean, so, I can't allow you to adjust. I can't allow you to adjust for starting at 5:00. At that point, you know, he-- and I mean, when I say a huff, I mean, he left in a huff. He just said, okay, you know, he yelled at me, like, okay fine, forget it. Forget I asked. And he marched back to his desk. At that time, I had to go qualify with my handgun. This was just-- this was just that day in the year. Coincidentally I had to go down to the range that day and qualify with my handgun. So, immediately after having this conversation with Justin where I told him he can't adjust because he wouldn't do any work that morning, I went down to the range and while I was down there, I got several text messages on my bureau phone that-- the text messages were for me to come back up to the office, that Justin was out of control. And so, I finish qualifying and I went back up to the office. By the time I got back-- by the time I got done qualifying and got back up to the office, I-- Justin was not in the office and Captain Pashley told me Justin had-- was sent-- he was escorted away from the property, that he had-- that Justin had an outburst in Captain Pashley's office and when I asked, like, what was this about? What was he upset about, you know, Captain Pashley didn't divulge any details to me. He just said no, he had an outburst. This is something he's been doing at these different-- up in personnel or IPR or human resources and he had another one and he's going home for now, you know, and it'll be-- human resources will deal with this, and he didn't really tell me much more than that. One of the people who texted me, I talked to that person--

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -51-

MS. PHILLIPS POLICH: I'm going to object to this being hearsay and if these are texts, then--

THE CLAIMANT: Please provide them.

MS. PHILLIPS POLICH: -- let's provide them.

THE ALJ: Okay. Ms. Vu, I would encourage you to redirect this line of questioning or if you would like, you can provide the text messages. What would you like to do?

MS. VU: Sorry, can we have a moment to see if we can locate the texts?

THE ALJ: Okay.

MS. VU: Judge Ilias?

THE ALJ: Yes.

MS. VU: Okay, we are back. I'll redirect the question just because the text is such a long ways back that it's hard at the moment to scroll back.

THE ALJ: Okay.

Q. But-- so, Lieutenant, did you see Mr. Callaway again after that day?

A. No, I don't think I've seen him-- I don't think I have seen him since then.

Q. And what was your understanding for his absence?

A. My understanding was that he had a pretty significant outburst shortly after I told him he could not adjust that day, that he went to Captain Pashley and yelled at Captain Pashley for quite a while and it alarmed the remainder of the office.

Q. To your knowledge, Lieutenant, you know, we looked at the IPR transcript that's Exhibit 16. To your knowledge-- and then of course earlier you testified about the IPR investigation about the missing bike light. To your knowledge, did IPR ever pursue any additional investigation or recommend discipline based on any of the

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -52-

complaints that Justin-- or Mr. Callaway, made?

A. I don't know what IPR did with their investigations, and I didn't really ask too much about it, yeah.

Q. Okay. And then, final question, besides me, who else have you spoken with about Justin-- or about Mr. Callaway's workers' compensation claim?

A. I got a call from I think it's Viki Bisby, probably about a year ago or maybe even a little bit more than a year ago. I think it was sometime in 2024, early 2024 maybe. I got a call from her about Justin's workman's comp claim and so, yeah. I mean, I told her pretty-- a summary of everything that I've gone through here, how-- you know, the complaints that were raised to me. I went through them and which ones I could have any influence over, which ones I couldn't have any influence over. What advice I gave Justin. Ultimately, you know, I told Viki that, you know, the main issue was Justin got to a point where he was upset about a lot of stuff that was not really work related and he was asking for accommodations for the workplace, but he couldn't articulate what accommodations exactly he needed and he was trying to draw some sort of link between these events that have upset him and the accommodation he needed, but he never could really explain what accommodation he needed and that was frustrating for him and frustrating for us and you know, ultimately, you know, at my level with my experience and education and everything that I know of the things that he was complaining about were not really issues I had much control over. And the things that I did have control over; I tried to do what I could with them.

Q. Okay. Actually, this is my last question. Looking back at Exhibit 16, was there anything in that transcript that you wanted to respond to specifically?

A. You know, there were a handful of things that struck me as, you know,

Workers'
Compensation Board
Hearings Division

exaggerations and-and it kind of-- like I said, I tried my best to make Justin feel pretty welcome in the workplace having a daughter who's on the spectrum. I wanted him to feel supported and comfortable and seeing some of the things that are in here, they're pretty gross exaggerations from the information that I got from Justin when he initially brought them up to me versus the way he's describing them here and the characterization that, you know, just using phrases like refused to help-- my supervisors refused to help me. I-- at times, you know, had-had to exercise my patience with Justin because I mean, I intentionally did this knowing that he had some struggles. And I spent an awful lot of time trying to help him with the obstacles that he was trying-trying to articulate to me. And, you know, for example, claiming that, you know, this guy was going to-- this Randy Graves, if it was even Randy Graves, was-- saw Justin and got the idea to commit suicide by cop by yelling at Justin and Justin characterizing this as, you know, this guy's going to bash my head into the wall, is nothing remotely compared to what he told me when I went through it step by step with him. When I went through it step by step with him, the guy was 60 yards away from Justin. Justin couldn't tell me what he said, what he looked like, what he was doing and now here, you know, two years later he's saying he almost got his head bashed into the wall, which is not even remotely close to what he told me. When he says that he came into work and he says, I reported it to a sergeant and I was told, oh okay, yeah, whatever and no footage was ordered. No police report for me. Nothing stopped Justin from getting a police report. He was told that he could file a police report. He was encouraged to file a police report. I told him that-- that you can go downstairs and file a report, but what you're telling me is not really describing a crime that is going to be prosecuted. You can file a report on it if you want. The idea of collecting video for this never came up. No video ordered for

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -54-

me, like it says it was unfair to him. The subject of video never came up until his bike light, he made this complaint about a cop stealing his bike light and then we got video. There was no video at Terry Schrunk Plaza to get. To characterize my response to him as, oh okay, well, whatever. When we talked about this numerous times ad nauseum, repetitively over the course of years and him being told you can make a report. You can go file a report if you want. What you're telling me, if you're telling it to me truthfully is not a crime. And there are a number of things in here that are just like-- well, yeah, I mean it's a summary of kind of how things played out, like, if you read this transcript, it's-it's confusing. It's not-- didn't-- like, it's not to the point. His complaint here in this transcript is never really defined. He says he was-- the notion that he was retaliated against is hard to understand. I don't-- and he can't really articulate it, and he doesn't articulate it here either. The kind of describing Greg Pashley as in-- as intimidating, if you-- I mean, that is actually, if you know Greg Pashley, is-- it's almost I mean, it's very hard to even imagine. He's very soft spoken although he's a taller guy, he's very soft spoken and pretty eloquent in his speech. I never saw anything closely resembling intimidation. In fact, I admired the fact that Greg Pashley would not discuss the details of this outburst. I thought Greg tried very hard to handle Justin's problems appropriately, using the correct channels and directing him to the correct people. So, yeah, and so, the part where, you know, my name in this transcript is misspelled on O-N-V-I-L-L-E, Onville, I-- it's pretty clear to me Justin is talking about Konczal, Sergeant Konczal.

Q. And you're on Page 6?

A. That's-- yeah, Page 6. And it says, hey sarge, a guy just charged at me on the way in. Oh yeah, well, you know, that kind of happens, whatever. That is not even remotely close to them-- I mean, the number of times we discussed this, the

number of times it came up, the advice that I gave him, the amount of time I spent talking to him about it, the very precise and detailed questions I asked him. No, I did not say, like, oh yeah, well, you know, that happens. I did say, you know, you and I both live in the City of Portland. You know that it is not uncommon to see a homeless person in some form of crisis, to see somebody yelling or screaming at you. Like, that happens. And so just to characterize it as, like, I didn't care, you know, didn't do anything to help him when I did and to the point of even, like I said, trying to forge a little bit more of a friendship because I just wanted to be a supportive supervisor. And I was understanding, I guess, of his-- because of my own daughter, like, wanting him to feel welcome and to be characterized as I didn't care. He was retaliated against, like, his basic rights were taken from him. I-I don't even understand where anything like that is coming from.

Q. All right, Lieutenant, is that-- do you have anything more or would you like a few more minutes?

A. I really, yeah, I guess that probably-- that actually probably covers everything. I don't know that there's anything else to add. I mean, it's a lot, just more of the same. I never saw any retaliation. I never saw any intimidation. I tried numerous times to go through his various complaints in detail to figure out what I could do about them. The things I could do, I did, and the other things I tried to explain to him repeatedly why I couldn't. And he, over time, just became more and more escalated to the point that it kind of-- you could kind of see that one day this is going to end with him having a massive outburst because he's just getting more animated and escalated over these things that, you know, not willing to leave in the past.

Q. All right, thank you, Lieutenant. That concludes my direct, Your Honor.

Workers'
Compensation Board
Hearings Division

KONCZAL -D- -56-

THE ALJ: Ms. Phillips Polich, any cross?

MS. PHILLIPS POLICH: I have a question. Is this case-- is our hearing set for all day?

THE ALJ: Yes.

MS. PHILLIPS POLICH: Okay. Well, then, I--

THE ALJ: Hello? Ms. Phillips Polich, I can't hear you.

(Off the record)

THE ALJ: We are back on the record. Ms. Phillips Polich, what were you saying?

MS. PHILLIPS POLICH: Since we're set for all day, I was going to suggest that maybe this would be a good time to break for lunch so that I can talk with Justin before I begin my redirect and that we would-- and I was suggesting perhaps we reconvene at 1:00.

THE ALJ: 1:00 is actually going to be hard for me. Could we just do like a half hour lunch, is that okay?

MS. PHILLIPS POLICH: Sure.

THE ALJ: Okay.

THE CLAIMANT: I didn't eat anything.

THE ALJ: Okay, so, like maybe noon?

MS. PHILLIPS POLICH: Well, I just-- so, if we're set for all day, I'm not sure how 1:00 is a problem. I'm not trying to be--

THE ALJ: Oh, I don't mean that, I just mean for picking up my son in the-- if this is going to go all day, it would make it a little difficult, but that's all. If we

-58-

end at 5:00, I'll just have to try to figure out a way to do it.

MS. PHILLIPS POLICH:  I can probably get a bite and talk with Mr. Callaway who has no-- is neurodivergent.  It's going to probably take me a little bit longer than a half an hour.  So, I need--

THE ALJ:  Okay.

MS. PHILLIPS POLICH:  -- at least an hour.

THE ALJ:  Okay, let's do 12:30 then.

MS. PHILLIPS POLICH:  Okay.  All right, sounds good.

THE ALJ:  All right, thank you.

MS. PHILLIPS POLICH:  All right, thank you.

MS. VU:  Jodie?

MS. PHILLIPS POLICH:  Uh-huh?

MS. VU:  Are you going to need Lieutenant Konczal?

MS. PHILLIPS POLICH:  I will, yes.

MS. VU:  Okay.

MS. PHILLIPS POLICH:  To cross examine him, yes.

MS. VU:  I wasn't sure if that's what your plans were.

MS. PHILLIPS POLICH:  Yes.

MS. VU:  Okay.

THE ALJ:  Okay, so we'll reconvene--

MS. PHILLIPS POLICH:  Okay.

THE ALJ:  -- at 12:30 and I'll call you both back.

MS. PHILLIPS POLICH:  All right.

Workers' Compensation Board Hearings Division

THE ALJ:  Thank you.

MS. VU:  All right, thank you.

MS. PHILLIPS POLICH:  Thank you.

(Off the record)

THE ALJ:  We are back on the record, and we took a short recess and Ms. Phillips Polich, is there any cross examination you'd like to do?

MS. PHILLIPS POLICH:  Yes, I'd like to cross examine the Lieutenant, please.

THE ALJ:  Okay.  Go ahead, please.

CROSS EXAMINATION

(BY MS. PHILLIPS POLICH:)

Q. Thank you.  Lieutenant, my recollection was that you indicated at the beginning of your testimony that you were testifying from memory.  Your testimony regarding events that happened two years ago spanning approximately four years of employment was quite detailed.  Were there documents you reviewed in anticipation of your testimony today?

A. No.  In-- well, actually one, and that was Justin's transcript from the Independent Police Review.  Other than that, I didn't refer to any documents or look up any old documents in the past, like, probably a year ago or more, I was, given like a notification came in email that there was some kind of complaint filed about-- you know, regarding Justin's work status or something and I was contacted by HR, like, did you have any notes on this and I provided them my notes but I have not referred

Workers'
Compensation Board
Hearings Division

KONCZAL -X- -59-

to them since that time.

Q. Okay. And when did you review the transcribed statement that you-- that we have in our record as Exhibit 16?

A. I was provided that yesterday, so I read that yesterday afternoon and I've referred to it a couple of times today. I haven't actually read it today, but, like, I've looked at-- I looked through it during my testimony.

Q. Okay. Do you know whether Mr. Callaway reported his safety concerns to others at the City of Portland?

A. I-- yes, I do know that he had talked about his safety concerns to the other sergeants in the office, to the lieutenant in the office, the captain in the office and there were, you know, rotations in those ranks. So, there were several lieutenants. At one point I was a lieutenant, an acting lieutenant there. There were several captains that came through-- Chris Gjovic and Captain Pashley and Amanda McMillan. And Justin, to my knowledge, had raised issues with all of these people.

Q. Okay. And you testified about an investigation into a bike light theft. Is there documentation or a case number assigned to that investigation?

A. Yeah, there is. I don't know what it is. I referred it to IPR and that was back when he-- when Justin first brought the issue up to me, so it's a couple of years ago. I don't work in IA anymore, so I do not have access to that information, but yeah, I mean, it was formally investigated by IPR (unintelligible).

Q. Okay. And do-- and you also testified about a meeting with Mr. Callaway in 2023 where you went over all of the safety concerns one by one. Do you have any documentation of that meeting?

A. I do not.

Q. Do you know when--

A. (Unintelligible) and I don't have any-- I don't recall taking any notes. I went into it with a notepad and a pen, and as I went through them, and the notes I was going to take were going to be actionable things related to the workplace that I had some sort of-- any kind of influence or control over and when I got to the end of his list of complaints, I-- there was nothing more that I could do that I had not already done.

Q. Okay. So, what did you do in response to these-- any of these complaints-- safety complaints that Mr. Callaway raised?

A. Well, as he raised them, one by one, I gave him advice on what he should do or I tried to explain to him why it was that, you know, that wasn't a police bureau issue and why it was-- like, I can't help you with that.

Q. Okay. And do you recollect what safety concerns were discussed at this meeting in July of 2023 where you were planning to take notes, but took none?

A. Well, it-- you know, this phrase you're using, safety concern, this is like a new phrase that Justin didn't use back then. These complaints were individually made over the span of years and as his behavior about these complaints escalated, it-- his work deteriorated and he got to the point where he was very high maintenance, complaining about things repeatedly that we had already addressed, like, I'm sorry, Justin, that was the fire bureau. You need to bring that up with the fire bureau. I cannot help you with that. This guy downstairs that threatened you, feel free to-- you can call nonemergency. You can call 911. You can go downstairs and talk to a central precinct officer. You can make that report. Whatever it was-- the bike light, like, I went over with him, like, Justin, like, you don't know that it was-- you don't know that it was stolen-- you don't even know where it went missing at, but you're accusing central precinct personnel of stealing it. And okay, fine, if you are making a

KONCZAL -X- -61-

complaint, I will take a formal complaint from you and assign it to IPR so they can investigate it independently and so, it wasn't necessarily-- he wasn't bringing up safety concerns. At one point, he was very concerned about the compliance with masks and people wearing masks at the beginning of the COVID pandemic. And this was an issue that was brought up many times by Justin and it was also brought up from the chief's office and that's why he ended up having to-- I think ended up having to process a lot of SIs about people not wearing their masks and there's a discipline matrix that we go by and if you looked at the matrix, like, this-this mask wearing was something that came up during the pandemic. It wasn't-- it's not a part of the police bureau directive. So, like, a memo came out saying the expectation was to wear these masks. When people-- when complaints were made against people not wearing masks-- if a supervisor encountered somebody not wearing a mask, they reminded them to put their mask on. If a member of the public made a complaint about somebody not wearing a mask, it was an SI. It was an SI because it was low level misconduct. Justin was demanding that people be terminated for not wearing masks because not wearing a mask during the pandemic threatened his life and that's a bit of an overreaction. He was demanding that his coworkers be fired. Like, that's a bit of an overreaction. I will tell him to wear his mask. Finally, one day Captain Pashley put up a letter saying you-you know, everybody's required to wear their masks. If not, we'll be elevating the disciplines. So, everybody started wearing their masks. So, the issue that he is raising about not wearing masks was handled. He brought it up, like, the first time he saw somebody not wearing a mask, he immediately went and complained about it and demanded that they be fired. That is a bit of an overreaction. So, yeah, it wasn't like, hey, I have these safety concerns. I'm very concerned about my safety. It was-- a lot of these things were completely

Workers' Compensation Board Hearings Division

unrelated-- there was no common theme that this was related to my safety. Over the time it turned into, like, I need an accommodation for my disabilities, and I was like, okay, what's your dis-- and over time, he started to try and make this correlation between these various events and his disabilities. Like, he could never really articulate it, and he could never really explain what accommodation would help him.

Q. All right. So, so did-- I thought I heard you indicate that Mr. Callaway indicated that his coworker's not wearing a mask threatened his life. Is that not a safety concern?

A. Well, it was a safety concern, and it was handled.

Q. Okay. Well, did not wearing a mask threaten people's lives during COVID?

MS. VU: Objection.

THE ALJ: What's the objection?

MS. VU: Foundation.

THE ALJ: I think she can ask that question.

A. Yeah, not in my opinion, no. And I didn't have any concerns in the IA office either. We-- you know, we worked every day-- while most people were, you know, at home and doing whatever, you know, we were essential employees. We worked every day. We went into the office every day and we saw people protesting every day, like, standing side by side, hundreds of people surrounding the Justice Center, breathing and sweating on each other and not getting sick. And so, going into the office and seeing one person one day not wearing a mask was not a major concern of mine. I go to the grocery store and see people not wearing masks or go to the bank and so, no, I didn't think it was-- the employee was reminded to wear his mask and then the problem was (unintelligible).

Q. So, are you testifying that this is a single, isolated incident of a coworker not

Workers'
Compensation Board
Hearings Division

wearing a mask? I thought you told me earlier that there were over 40 investigations into this.

A. No, the 40 investigations were into another issue about documenting consent searches with your camera phone. That's what the 40 SIs were over and there were SIs generated over employees not wearing masks. To my knowledge, Justin complained about a couple of employees, but it was the very first employee he complained about in that-- when he brought it up, he brought it-- like, the-- you know, that man's endangering my life. He should be fired. This is somebody who works in the office with us. No, that-- I don't believe that endangered Justin's life and it was dealt with.

Q. Do you know whether or not Mr. Callaway contracted COVID during the pandemic?

A. He told me that he did, yeah.

Q. And did he tell you what he believed the source of his COVID to be?

A. I don't know what the source of his COVID is. If he told me what he believed it to be, I don't remember.

Q. Okay. Do you know whether or not there were any investigations into whether or not people that Mr. Callaway's coworkers were properly wearing masks consistent with the mandate?

A. It-- the way it was handled by the bureau was consistent with bureau discipline. It-- like I said, it was low level misconduct. So, it was certainly something a supervisor could address like, hey, why are you not wearing your mask? Put on your mask. If it happened again, it would be elevated to an SI. And generally, after that, that's where it stopped because after a couple of months of a lot of officers not wearing masks, like, the chief's office began emphasizing it. We have gone over

Workers'
Compensation Board
Hearings Division

KONCZAL -X- -64-

this. You've been told to wear a mask. It will result in escalated discipline if you refuse to do so. And that pretty much put an end to the problem. Because mask compliance was shotty, like, in-- everywhere, I mean, it wasn't like specific to the bureau. I mean, this was-- the whole pandemic created a lot of divisiveness.

Q. Okay, and so, during your testimony, you stated that you wanted Mr. Callaway to feel like a whole employee. What did you mean by that?

A. I-- what I meant was I wanted him to feel heard and I wanted him-- I wanted to be a good supervisor, so I would ask myself, what would I expect a good supervisor to do right now and regardless of what I thought of the credibility of Justin's concerns, I wanted to let him know that I heard him and that I was concerned. So, I would regularly talk with him about any number of things, but I would touch in with him regularly. Justin would often say things that were completely non-sequitur, right, to a professional meeting we were having. Justin would say something that was, like, out of the blue and you could sense other people being embarrassed for him. I didn't-- I wanted him to feel welcome. I didn't want him to feel awkward or estranged or, you know, distanced in any way. So, like, when he would say things that were-- other people thought were, like, what is he talking about, you know, I was like, meaningful and I wanted to be like, hey, Justin, thank you for that. You know, we can talk about that more a little bit later, like after this meeting. So, I would try to affirm the things that Justin was doing or his behavior or give him positive reinforcement. Like, hey, you did a good job on that, you know. Because I wanted him to feel welcome in the workplace. Frankly, his incessant talking just, it turned a lot of people off. And I wanted him to feel welcome and not, like, estranged.

Q. Okay. Was Mr. Callaway ever formally disciplined associated with his work

Workers' Compensation Board Hearings Division

performance during the time that he was employed at the City of Portland?

A. Nope.

Q. Do you know when Mr. Callaway was diagnosed with autism?

A. I do not.

Q. What-- you testified about Mr. Callaway showing up at city offices while he was on FMLA leave. What city offices did he show up at while on leave?

A. From what I heard, he-- it was the personnel division, it was human resources, and it was IPR. That's what I remember hearing.

Q. Is there-- were there any complaints or documentation about these visits to these particular departments?

A. I don't know if there was any documentation. I know some of the nonsworn people who worked up in personnel were concerned about it.

Q. And do you know who they reported those concerns to?

A. I believe it was Captain Pashley.

Q. I'm going to take a look at my notes. I don't think I have any additional questions at this time.

THE ALJ: Thank you, Ms. Vu?

MS. VU: I'm sorry, Judge, you cut out. What was the last part?

THE ALJ: Oh, I was just saying, thank you, do you have any follow-up?

MS. VU: Yes. Just a couple.

Workers'
Compensation Board
Hearings Division

KONCZAL -X- -66-

<u>REDIRECT EXAMINATION</u>

<u>(BY MS. VU</u>:)

Q. Lieutenant Konczal, can you explain what the discipline matrix is?

A. Yeah, so, the discipline matrix is also known as the corrective action guide. Because there are a lot of rules to working in the police bureau, it's very common for rules to be violated. Now, not all rules would carry the same discipline if you were to violate it. For example, you know, there's a rule or there used to be a rule about your appearance, right? Like your hair had to be a certain length or something like that. If it was beyond that certain length or if you were late for work or something like that, you would actually be violating one of the rules. Those are very minor rules to violate. In the spectrum of police work, you could end up having to defend your life and shoot somebody. If you shot somebody and it was found out of policy, obviously that would carry, like, a much greater discipline than, you know, forgetting your business card, you know? So, the corrective action guide kind of spells out, like, where all these-- you know, if somebody is found to be out of compliance with our directives, where does it fall on the corrective action guide? And so, this guide was made up to keep it uniform, so people are not, like, punished desperately depending on who they are, like, the corrective action guide was to give some uniformity and objectivity to it.

Q. Thank you. We also talked about safety concerns. Were you the correct person that Mr. Callaway should have reported any-any safety concerns or really any work-related-- work problems, are you the correct person to report to?

A. Technically, the PASSes report to the lieutenant. I was a sergeant, but during a long stent-- during Justin's employment, I was also acting lieutenant and again, there was, you know, Lieutenant Gjovik was there, Russell was acting lieutenant--

Workers'
Compensation Board
Hearings Division

Alicia Russell was acting lieutenant for a time. Greg Pashley and Dave Jackson, I think, were lieutenants there at one time or another while Justin worked there. So, it would've been to report it to the lieutenant, but he could've reported it to me and oftentimes he did report his concerns to me. But he-- again, a lot of times I would hear him discussing these events and as I heard him, his tone become more serious or more elevated or more escalated, I would pull him into my office and try and get the details to see if it was something that was work related or something I needed to get involved in or not.

Q. And then in terms of safety concerns, were you aware of any other safety concerns Justin might've had even off of work-- outside of work?

A. Yeah, well, I mean, I do remember him coming into work one time and telling me about, like, his neighbor's house being burglarized or some guys pulled up in the middle of the night and they went to his neighbor's house, and they stole a bunch of stuff out of the back yard. And Justin was telling me that he confronted these people as they were trying to leave, like, I don't know, they stole, like, a grill or a gas can or something like that and I thought, whoa, wait a minute, man, like, you should not be confronting burglars in the middle of the night by yourself. Like, you should be calling 911, maybe getting a license plate number if you can, but you should not be confront-- like, that's super dangerous. Like, they could've had a gun or a knife or anything. They could've hurt you. And I do remember him telling me about an incident-- I don't know how many years ago it was, but it was way before he was employed with the police bureau-- where he-- I think he said he was, like, knocked unconscious and wound up with like a plate in his head because he was knocked unconscious and fell to the ground. So, some kind of fight he was in and confronting these burglars and things like that were things he told me about personally. The

Workers'
Compensation Board
Hearings Division

KONCZAL -ReD- -68-

other safety concerns, obviously he brought up this homeless guy outside of the Justice Center who he believes is Randy Graves and he-he believed that his missing bike light was a theft intentionally done to diminish his safety.

Q. Right, thank you, that's all I have.

THE ALJ: Thank you. Ms. Phillips Polich, anything else?

MS. PHILLIPS POLICH: I don't have anything else.

THE ALJ: Okay. Ms. Vu, is there anyone else you would like to call?

MS. VU: Yes, I would like to call Viki Bisby--

THE ALJ: Okay.

MS. VU: -- Claims Analyst. And I believe I gave a number to Niki.

THE ALJ: Yes, I have a number listed, so let me--

MS. VU: Okay.

THE ALJ: -- go ahead and conference her in.

MS. BISBY: This is Viki.

THE ALJ: Hi, this is Judge Ilias. I'm calling you because we have a hearing going on right now.

MS. BISBY: Correct, yes.

THE ALJ: Okay.

MS. BISBY: Hi, how are you doing?

THE ALJ: Great. Let me conference you in with everyone.

MS. BISBY: Okay.

THE ALJ: Hello, I have Ms. Bisby on the line and Ms. Bisby, before we begin--

Workers' Compensation Board Hearings Division

<u>VIKI BISBY,</u>

called as a witness in behalf of the defendant, having been first duly sworn, was examined and testified as follows:

THE ALJ:  And can you please state your name and spell it for the record?

THE WITNESS:  Yes, it's and that's V-I-K-I, last name is B-I-S-B-Y.

THE ALJ:  Thank you.  Ms. Vu, go ahead, please.

MS. VU:  Thank you.

<u>DIRECT EXAMINATION</u>

(<u>BY MS. VU</u>:)

Q.  Viki, can you tell us your employment history with the city and include your job title?

A.  Yes, I'm employed by the City of Portland since November 1999 as a Senior Work Comp Disability Analyst.

Q.  And what do you do-- what are your job functions as a senior disability analyst?

A.  The main job functions is to investigate and mitigate workers' compensation claims for the bureaus that I'm assigned to at the city.

Q.  When was your first contact with Justin Callaway?

A.  That was on October-- excuse me-- October 2, 2023.

Q.  And who-- can you tell me if you talked with anyone else during the course of investigating Mr. Callaway's claim?

Workers'
Compensation Board
Hearings Division

BISBY  -D-  -70-

A. Yes, I did. I talked with Kristina Porreco. I might be saying that incorrectly. She's with BHR. I actually talked to her and then James Morris, a FMLA coordinator who referred me to Sergeant Konczal that I spoke to on, I believe it was October 4, 2023.

Q. Thank you. Did you attempt to schedule a recorded statement from Mr. Callaway?

A. Yes, I did. I assigned his case to an investigator that we use on workers' compensation claims amongst others, Larry Plant, who did reach out to Justin but he indicated to me-- Larry responded to me that Justin didn't want-- not want to give his statement until he had an attorney, that someone had advised him that he needed to get an attorney before he'd give a statement.

Q. When was-- what was your overall impression based on your investigation that led you to issue the claim denial?

A. The-- my-- in my professional opinion after I spoke to-- I did speak to Justin at great length when he first called and then also the BHR and Sergeant Konczal-- under my professional opinion, it didn't rise to the standards of a stress mental disorder under ORS 656.802. There wasn't clear and convincing evidence that it did arise out of the course and scope of his employment in my professional opinion.

Q. Did you also request any medical records for Mr. Callaway?

A. Yes, I did request-- there was like six providers that I sent requests to for medical records, and we did not receive any response to that.

Q. Were-were a couple of them returned, is that what--

A. Yeah, there was two of them I believe that were returned as not deliverable, not at this address, but then the others, we just did not receive any records from the providers or a response that we needed to get a different type of release or anything

Workers' Compensation Board Hearings Division

of that nature.

Q. Okay, that's all I have for you, Ms. Bisby. Thank you.

THE ALJ: Thank you.

THE WITNESS: You're welcome.

THE ALJ: Ms. Phillips Polich may have some questions for you.

MS. PHILLIPS POLICH: Thank you.

## CROSS EXAMINATION

(BY MS. PHILLIPS POLICH:)

Q. You-- Ms. Bisby, you testified that you had what you described as a long conversation with Mr. Callaway about his claim. How long was that conversation?

A. Oh, you know, I don't have the exact minutes, but, you know, I would say probably like half an hour, you know.

Q. And what did--

A. On an estimate.

Q. -- and did you testify the conversation occurred on October 2, 2023?

A. That is correct. Yeah, that is correct.

Q. And you testified that you requested records from six medical providers. What-what medical providers did you request records from?

A. The records that I requested were from-- there was an Elita, E-L-I-T-A, Wong, and Adrienne Cardiell, Jet Maloney (phonetic) and that was one of the ones that was returned. Then also, Don Marr and that one was returned to us. And then there was a Heidi Bermeosolo.

Q. I only counted five.

Workers' Compensation Board Hearings Division

BISBY -X- -72-

A. Okay, well, did I say six then? That's all I got on my list. Sorry, it was five.

Q. Okay, and can you tell us, did you make all those requests on the same date?

A. Yes, and they were actually resent as well. They were requested on the same day and then resent again about eight weeks later.

Q. So, what day did you make these-- the first request for these records?

A. The original requests were in March of 2024. Actually, there was two that-- oh no, that-that's when those got returned to us. On March 8th and then Don Marr was on March 27th and--

Q. When we talked-- I just want to make sure we're talking 2024?

A. Yes, correct, 2024.

Q. Okay. And then when were the second-- when were the records re-requested?

A. They were resent to-- on June 5, 2024.

Q. You testified that you spoke with I guess sergeant, now Lieutenant Konczal. Did you indicate that that was on October 4, 2023?

A. Yes, it was after I spoke to Kristina and James Morris. James-- actually, James Morris-- actually, oh, -that's-- I'm looking at my notes, sorry. I talked to James on October 5. He's the FMLA coordinator at that time for police and he's the one that gave me Sergeant Konczal's name. So, then I spoke to him October 6th.

Q. And what information did you receive any documents from either Kristina Porreco or from James Morris?

A. I didn't receive any documents from them. We usually don't receive FMLA documents under-- you know, with workers' comp. James Morris advised me to call Sergeant Konczal.

Workers'
Compensation Board
Hearings Division

Q. Okay. And so, you indicated you spoke with Sergeant Konczal on October 6, 2023. How long did that conversation last?

A. That was a long conversation as well and you know, I can't really tell, it was probably a half an hour as well.

Q. And was that conversation with sergeant, now, Lieutenant Konczal recorded?

A. No, it was not.

Q. And you indicated-- did you take any notes from that conversation?

A. I did take notes and then I transferred them over to our risk management database.

Q. So, tell me what that means in plain speak. Do you have notes or not?

A. I don't have actual physical handwritten notes. After I transferred them over to our database, they were destroyed.

Q. Okay. And so, when they are transferred to your database, are you then just typing in what your handwritten notes were?

A. Correct. Mm-hmm.

Q. And so, do you have those there in front of you?

A. Yes, I do.

Q. So, can you read us what you typed in for your discussion with sergeant, now, Lieutenant Konczal?

A. Okay. It's long.

Q. Okay, we're here.

A. Oh, okay. It says, I spoke to Sergeant Konczal Friday, October 6th. He was familiar with the Claimant. He said he really tried to be an advocate for Claimant while he was there and that Claimant was mostly in his charge. Incident with person "charging him" he said that they are puzzled to what he described. It was in 2020. It

Workers'
Compensation Board
Hearings Division