was not unusual for protesters to be out front. Three older women also got accosted out there. If you look like you work there, that is when they would usually say something. Employees in his group were given the opportunity to work from home. Everyone was given this opportunity and provided with laptops. Claimant said, for his wellness and the wellness of his son, he was going to come in, wellness for their relationship. He also rides his bike in too for exercise, so he chose to come in, did not have to. He was coming to work and going in back metal doors with his key, which is a secure door. A guy was having a mental breakdown or something in the middle of the intersection and sergeant said not sure that the guy was yelling at Claimant, but Claimant said he started to come his way. "He was looking at me." Claimant got in the door and reported it to Alicia Russell, but apparently, she did not do anything about it per Claimant. Claimant kept bringing this up. Sergeant said sounded sometimes like in jest, but it was constant and so, it may have been weighing on him, so he called the Claimant into his office, and they discussed it. He brought up how far away the guy was, et cetera. He said, since there really was no crime, nothing that they can do. He could send to the DA, but they would not do anything with or won't do anything with it. There was no injury. He thought that took care of things, but about a year later another employee, Tyson Estes, got attacked by pit bulls belonging to homeless people and was torn up pretty bad. Everyone was horrified by it and talking about it. It did upset Claimant, but when they sent a card around and donations for food for Tyson, Claimant would not donate. He said that no one made a big deal about him being attacked. Sergeant thought, why are we still talking about this. Since then, the thing with Tyson was brought up during conversations that no one cared about him like they did Tyson. Sergeant remembered an incident where Claimant came in saying he had confronted burglars

Workers'
Compensation Board
Hearings Division

trying to get into his neighbors home. He showed him the film. He actually came up to them. Sergeant said he probably should not have done that and just report an incident. Claimant contested-- complained about Hardesty (phonetic) creating a scarry environment for workers. Sergeant said he'd began to make a big deal of things that happened around there. He stubbed his toe. He would say I'm the only person that comes in every day. From day one, odd conversations, but sergeant said that he knew he had some problems so he would always try to help the Claimant. Chris Joling (phonetic) who's no longer there hired him. Claimant told Sergeant Konczal that he just wanted to be straight with him. He said the guy on the street was not an inmate, but Claimant had an unusual habit of pursuing anything having to do with law enforcement. He was working through dragnet flyers, be on the lookout for this person type of flyers and he spotted the guy that charged him. He pointed out that the guy was a sus-suspect in a stabbing. Sergeant Konczal noticed a big change in Claimant around March 2023. He's usually overly talkative, but he suddenly was withdrawn. Sergeant thought maybe he was working on some things, seemed like he was pouting. Sergeant called him to his office and said how-- he told him how he always brightens the day with his optimism, trying to cheer him up, but Claimant blew up at him. He said, "I'm done, can't work like this" and went on about Tyson. Another issue during the protest time, the fireboats were out spraying water with their big spray hoses for solidarity to help people come together. Claimant said that they used to use fire hoses on black men and this upset him. Claimant was off for summer for probably two months, and he did come back one day. He told Sergeant Konczal that he was leaving at 1:00 p.m. as he had started at 4:00 a.m. His shift is 9:00 to 5:00. Sergeant asked him what he was doing-- what he was doing 4:00 a.m. workwise. He said that he sent an email (to whom) to

Workers'
Compensation Board
Hearings Division

personnel he said and that he also had went to physical therapy. Had had an off work bike accident. Sergeant told him that one email doesn't constitute work for five hours and that he needed to work his shift or use his own time. Claimant got really upset about this and went up to Pashley's office ranting and raving-raving. Officers were scared by-by this, so he was sent home, paid for the day, and put on paid admin leave as this was inappropriate behavior for the workplace. And that's it.

Q. Thank you.

A. You're welcome.

Q. Do you have any-- do you have any notes about your conversation with James Morris?

A. Yeah, there's-- it's not as long.

Q. Okay, well, why don't you tell us what that one says.

A. That one was on October 5. Spoke to James Morris, FMLA coordinator for police. He said that Claimant was hired through a vocational program. Not sure if it was a work injury or disability. He didn't really do good during probation, but no one did anything. He mentioned that police officers do the reviews on admin staff and that they may not be the best at doing these reviews. James said that he has had a couple of FMLA approvals, April to July 2023, question mark, he was not sure if he was not at his desk, but he would get back to me and he did not get back to me, but he-- April to July 2023. He said that he believes that Claimant was granted intermittent FMLA leave, currently now on paid admin leave, so he hasn't done any more FMLA approvals. James said, it appeared that Claimant just had a steady progression downhill in the last year. We briefly discussed the incident where he said he was "charged by an inmate." James said that--

THE CLAIMANT: (Unintelligible).

Workers'
Compensation Board
Hearings Division

A. -- he doesn't know. James said that he doesn't know much about that but that there was no injury reported so it did not amount to a crime. He told me the best one to talk to about this was Sergeant Konczal and then I got sergeant's phone number and then a note I left a voicemail for Sergeant Konczal on October 5.

Q. And then you also spoke to Kristina-- I'm not—I don't have her last name--

A. Correct.

Q. -- but Porocco (phonetic)?

A. Porreco, P-O-R-R-E-C-O.

Q. Okay. And do you have any notes from that conversation?

A. I do. Mm-hmm. That was on October 4th. I spoke to Kristina Porreco in BHR, October 4th. She said that all the things that Claimant were alleging occurred before she started at the city. She said that there is a note from the counselor he has seen that he cannot work in PPB anymore, cannot work in a command-driven place. She said that there are multiple diagnoses on the paperwork including preexisting chronic PTSD. She said that the Claimant had cycles where things were going good, but then they would go bad. Greg Pashley is current captain. She said he has been very open about his medical status. Discussion with him months ago and they were wondering why he wanted to relive everything. They offered an 801, but he refused stating "that was their job." She said that he refuses to talk to her anymore. She said that the first time anyone brought up filing a claim he said it would be good to know about the process, but he doesn't want to be involved in it. She said that her, Lisa Rogers and Lynn met a few months ago back on this. He was making people uncomfortable in the workplace, that is why they put him on paid admin leave. He would sob, scream, et cetera for the day. She said that other officers were getting uncomfortable. There is one incident about COVID where he

said he got it at work in 2022, question mark. He said that he was not allowed to report it. He said he got it at one of the police gyms. Kristina believed that he was told how to report and take time off for this. He said that he now has longtime COVID from this. There was an email from April 2021 where he was on his bike and said someone came screaming at him. She said that no one ever said he could file a work comp claim. She believes that the bureau unofficially accommodated his disability. She said that he is transitioning now to using accruals, Monday, October 9 off paid admin leave and moving to separation because there is no job in PPB for him with the restrictions that the counselor provided. Claimant does still have some FMLA left, but after that he will be separated mid-October, question mark. I asked about the rehire list, but she said he's not on that anymore. It expired. He-- she said he feels wronged by the city. He said that the city needs to create a job for him. I asked if there was discipline and she said no, there isn't in her file. She said, where the staff-- the staff where he is, the police sergeants do the reviews, and they're not very good at that. She said he probably has had a dozen bosses during his time at the city. That's it.

Q. Thank you. When a City of Portland worker files a workers' compensation claim is it generally part of the city's investigation to take a statement from the injured worker as to the basis of their claim prior to making its decision to accept or deny a claim?

A. That would depend on the type of claim. You know, if someone got a foreign body in their eye or sliced their finger, you know, we're not going to have a statement on that, but we do make first contact on every claim that comes in. A member of our staff or the claim's examiners, myself, will reach out to the worker and make first contact.

Workers'
Compensation Board
Hearings Division

Q. Okay.

A. On all claims.

Q. All right, and when a City of Portland worker files a workers' compensation claim is it generally part of the city's investigation to obtain the medical records associated with the claim prior to making its decision to accept or deny a claim?

A. Yes, that would be a procedure, but that doesn't always occur if we find out about providers at a later day.

Q. And did you attempt to obtain Mr. Callaway's medical records as part of your investigation associated with his filing of his workers' compensation claim prior to issuing your denial in October of 2023?

A. I was unaware of his medical providers until we received information from MODA that he may have had treatment for this diagnosis, so it was after. If we don't know the medical provider, we can't request the records prior and we were unable to get his statement to get that information.

Q. Okay. And in this particular case, Ms. Bisby, how long does the city have to accept or deny a claim?

A. We have 60 days from employer knowledge day.

Q. Okay, and how many days did you make your decision in this particular case?

A. I have to get into another database.

Q. Well, if you don't know, that's okay, because you shouldn't be looking at anything that isn't in front of you already.

A. Well, it is in front of me, I've just got to get over to it.

Q. Right, right, right, I'm going to object to you looking at anything that I can't see right now, so.

Workers'
Compensation Board
Hearings Division

A. Okay, certainly.

Q. So, if you don't know when that was-- our record shows that the denial in here was dated October 13, 2023. Does that sound about right?

A. Correct, yes.

Q. And so, that would be about-- from what you testified to-- about 11 days from when you had--

A. Correct.

Q. -- knowledge of the claim.

A. Correct.

Q. How often does the City of Portland issue a denial within 11 days?

MS. VU: Objection, relevance.

THE ALJ: I'll allow it.

A. I don't have that information, yeah, I don't have records on how many claims are denied within that period of time, but you know, that there's a sufficient investigation done, you know, in that period of time, we would issue a denial, but I have no information on how many.

Q. Okay. What-- back in October of-- in October of 2023, what was your understanding of the situation or situations that Mr. Callaway's claim was based on?

A. You know, at that time, when I got notice of it, it was more like a stress, you know, anxiety type of situation. My understanding was that he was on paid admin leave and that he was, you know, afraid he was going to be terminated, so he filed the workers' comp claim and my understanding it was, you know, just more of a stress type issue.

Q. But what was causing the stress based on-- what was your understanding?

A. Well, after that long conversation with him, there was numerous things, you

Workers'
Compensation Board
Hearings Division

BISBY -X- -81-

know, and I'm not in his shoes, so my understanding was that he felt he was not getting listened to and you know, he had numerous incidents that he described, but they did not arise, you know, to being compensable under the Oregon statutes.

Q. Well, I'm trying to find out what those incidents were that you understood.

A. I read that note. I can go back to that.

Q. You read the note from-- you read-- so, I guess maybe it's not clear which he you're referring to. Are you-- my understanding is you were talking about your conversation with Mr. Callaway.

A. Correct, yeah.

Q. Are you-- okay. All right. And we didn't-- do you have a note based on your conversation with Mr. Callaway?

A. I-- yeah, that was that conversation I had on October the 2nd and there was-- you know, the incident about the guy charging him at the door trying to get in. I just read that long--

Q. (Unintelligible).

A. -- conversation.

Q. Oh, I thought that was with sergeant, now Lieutenant Konczal.

A. No, that was Claimant's. I read-- oh, I did not read Claimant's, I read--

THE ALJ: Yes, we have--

A. -- Sergeant Konczal's. (Unintelligible).

THE ALJ: -- I don't have any notes of the conversation between Mr. Callaway and yourself.

Q. So, so why don't you read us the note you have with Mr. Callaway?

A. All right. So, I called him on Monday, October 2, 2023, after receiving an email from BHR. Claimant works for PPB. He works as a PASS, police

administrative support specialist 1 or-or no, specialist. And then, I explained that I was calling to discuss processing of workers' compensation claims mainly stress, PTSD claims, inherent and workplace situations. Claimant had a lot of information to share. The main gist was that he was going to lose his job here shortly as he no longer has any paid leave (and FMLA is ending?). He said that he has the FMLA paperwork signed by a counselor that he has been seeing. He requested ADA accommodations and along those lines he has not been accommodated. Claimant stated he is autistic, and he needs things clear and it's not at the PPB. He said, one section does things differently than others. He said that sworn PPB are his managers. He mentioned safety issues inconsistency. On the safety point, he said that he had an incident where he passed by inmates and one charged into him while he was either coming or going from work. This really scared him, and he mentions PTSD. He went out of his way during the riots as he didn't want to go in the front way, so either you go through the riots or the back way through the inmates. This was apparently brought up (but may have been years later?) and the sworn manager said that there's no video of this confrontation et cetera. He mentioned this several times, so I asked when that was and he said, October 2019. Claimant said that he was trying to use EAP, but it was really difficult to use. He would call them, and they would call him back and it was a month later and they said they couldn't help him. During this time, he exhausted his sick leave. Now, they want to lay him off as he has no more leave. Claimant stated he's a single parent and he's had to use some of his leave for his son, but he feels that when a parent is going through issues it comes back to the child, and he had to deal with this. Claimant did come back after being on FMLA as he did not want to lose his health insurance benefits. He had a horrible week at work, he said. There's mention of a captain that is over

Workers'
Compensation Board
Hearings Division

him that he had to return to and that stressed him out. Also mentioned that he had requested ADA accommodations to come back and the-the captain open door was discussing his situation which he said was against HIPAA, et cetera. Another incident was that he was trying to transfer out of the section he was in. On the city application for senior PASS position, if you have trained or had subordinates under you. He said that his application was rejected because he truthfully answered no to this question. However, he has trained people before and had subordinates, but it was clearly stating for the PASS group. He said he wanted to be honest and so he did not state he trained anyone. His application was rejected. He had to fight this and apparently, he got back on the list for senior PASS. He had to ask for an interview again. He said when he first started for the city, he only signed up to be junior PASS as he is autistic, et cetera. Claimant also used the terms bipolar, that he may have been diagnosed with this in the past, question mark. I explained so many points that if he wants to file a claim he could. I would email him the form and then at that point we'll get an interview, and he can list specifically the incidents that he feels supports this. I also explain the need for his medical records. He seemed hesitant about this at first, but explained necessary for us to determine compensability. And I explained interim compensation, but we needed authorization. He said he has FMLA forms, but he said that the city is trying to lay him off. Claimant said he is familiar with Work Hardening; also, vocational rehab use in that arena. And basically, that conversation-- that's the end of that conversation, but it would've gone on longer but then at that point, I, you know, offered him the form, and said, you know, we'd be able to get more information from him at that point.

Q. Okay. And so, in-- there's an email that's in our record-- I believe it is Exhibit

Workers'
Compensation Board
Hearings Division

BISBY -X- -84-

15-- and you state your situations, although stressful and uncomfortable, are considered inherent in every working situation, especially in this world we are living. What, I guess, situations were you referencing there?

A. I don't have that email in front of me, but just the situations with, you know, people being downtown Portland. I've had to go downtown Portland and have also been charged at, screamed at by people down there. Just those types of situations that we're living in.

Q. And so, you see that as generally inherent?

A. For the-- yes, for this age that we're living in, yes.

Q. Okay. And does the city have a decision from Oregon Workers' Compensation Board that states that?

MS. VU: Objection, foundation.

THE ALJ: Hey, hey--

MS. PHILLIPS POLICH: Well, I'm (unintelligible) that that you asked-- you've already asked her questions based on her professional opinion, which she's provided to you, to which I did not object.

THE ALJ: I'll allow the question. Go ahead.

A. I'm sorry, what was the question again?

Q. Does the City of Portland have a decision from the Oregon Workers' Compensation Board that states dealing with homeless people and being attacked in downtown Portland is generally inherent?

A. No.

Q. Okay. Is that simply your opinion?

A. It's my professional opinion and there was additional--

Q. (Unintelligible).

Workers'
Compensation Board
Hearings Division

BISBY -X- -85-

A. -- there was additional issues that he parlayed that were generally inherent in every situation, you know, like with dealing with, you know, sergeants, captains, supervisors, managers, COVID, all of those were generally inherent in situations we had, not just the incident of the homeless individual.

Q. And so, do-- are you aware of any decisions from the Workers' Compensation Board that says dealing with COVID is a generally inherent--

A. No.

Q. So, again, is that simply your opinion?

A. That's my professional opinion.

Q. I don't think I have anything else.

THE ALJ:  Thank you, Ms. Vu?

MS. VU:  Thank you.

## REDIRECT EXAMINATION

(BY MS. VU:)

Q. So, Ms. Bisby, let's go back to the incident of the homeless individual--

A. Okay.

Q. -- that Mr. Callaway said charged at him.  After you spoke with Lieutenant Konczal, did you have a different version of that incident from sergeant-- from Lieutenant Konczal?

A. Yeah, it was a different-- it was a different-- it was the same, it was somebody coming across the street at him, but they actually, on both talking to Justin and-and the lieutenant, there was no physical injuries or anything like that.

Q. And then when we-- when you're talking about generally inherent, are you

Workers'
Compensation Board
Hearings Division

also referring to, for instance, doing some of the paperwork in the ADA process?

A. Yeah, that he had filed the FMLA paperwork and there was indications on the FMLA paperwork that there was preexisting PTSD. I mean, looking at the situation as a whole, it wasn't just one incident of the homeless charging him that caused me to deny the claim. There was the whole, you know, just all the conversations that I had and then looking at the Oregon statutes that there wasn't, you know, a mental disorder that existed in a real objective sense, and that the situations that he described, you know, some of them were inherent in every situation or every work situation.

Q. Would this also include his application for senior PASS position that you described as discussing--

A. Yes. Yes. Yes.

Q. And then also, based on your conversation with Justin, did it-- did it leave you with the impression that the reason he was filing the claim was because he was running out of paid leave?

A. Yeah, I had that impression, yes. A lot of that conversation was focused on that-- that he's losing his job and--

Q. All right, and then, back to the medical records, you-- just to clarify, it sounds like you requested those records based on information from MODA, is that correct?

A. That is correct, MODA sent us a list. We requested information on if they paid any claims as that occurs sometimes, and they sent back that these claims were paid. The treatment and the diagnosis codes were prior to this claim, so that's when we ordered them is when we received the MODA response.

Q. All right, thank you Ms. Bisby, that's all I have for you.

THE ALJ: Thank you, Ms.--

Workers'
Compensation Board
Hearings Division

BISBY -ReD- -87-

MS. BISBY: You're welcome.

THE ALJ: -- Ms. Phillips Polich?

MS. PHILLIPS POLICH: That doesn't raise anything for me.

THE ALJ: Thank you. Ms. Vu, is there anyone else you'd like to call?

MS. VU: No.

THE ALJ: Ms. Phillips Polich, anyone you would like to call?

MS. PHILLIPS POLICH: Yes, I'd like to recall Mr. Callaway, but can we take like a five-minute break?

THE ALJ: Yes, we can take a five-minute break.

MS. PHILLIPS POLICH: Okay, thank you.

THE ALJ: So, Ms. Bisby--

MS. BISBY: Okay, and then I may sign off now?

THE ALJ: Yes. Ms. Bisby, you can sign off and then the rest of you please stay on the line.

MS. BISBY: All right.

MS. VU: Jodie?

(Off the record)

THE ALJ: We are back on the record. Ms. Phillips Polich, is there-- you wanted to call-- recall Mr. Callaway?

MS. PHILLIPS POLICH: I do.

THE ALJ: Okay, wonderful. You're still sworn in, Mr. Callaway.

JUSTIN M. CALLAWAY,

recalled as a witness on his own behalf, having been previously duly sworn, was

Workers'
Compensation Board
Hearings Division

-88-

examined and testified as follows:

THE ALJ: Go ahead, please.

MS. PHILLIPS POLICH: All right, thank you. So, and as I said before I start questioning Mr. Callaway, I will, both Linh and Judge, I sent you, to try to streamline this response-- these responses-- I sent you offering it as Exhibit 20, I emailed it to Linh directly and I-- and uploaded it through Biscom as well as sending it to Niki, Your Honor, but it is a time-- two timelines that-that Mr. Callaway prepared essentially for me associated with this event-- or for legal counsel associated with these events and I would like to-- I'm going-- I plan to offer those as sort of rebuttal testimony to Lieutenant Cozumel [sic]--

THE CLAIMANT: Correct.

MS. PHILLIPS POLICH: I'm sorry. I probably said his last name wrong, I do apologize and so, just in the efforts of moving this forward, I am going to ask Mr. Callaway a few questions just generally about his preparation of those and a few other questions, but with the goal of keeping us streamlined on what's relevant to this hearing today. So, with that--

MS. VU: I object to this exhibit. You emailed it at 1:42.

MS. PHILLIPS POLICH: Right. Right, just like-- yes. I'm sitting here trying to do a hearing, yes.

THE ALJ: Okay, and what's your objection?

MS. VU: My objection is I've had no time to review this.

THE ALJ: You've had-- say it again?

MS. VU: I have had no time to review this.

THE ALJ: Okay, would you like to take some time to review it?

Workers'
Compensation Board
Hearings Division

-89-

MS. VU: Yes, please.

THE ALJ: Okay, so how about in 10 minutes we get back on?

MS. VU: That sounds fine to me.

THE ALJ: Okay.

MS. PHILLIPS POLICH: All right, great. Thank you.

(Off the record)

THE ALJ: So, Ms. Vu, do you have any objections to that document?

MS. VU: I do, but there's a lot of feedback on my phone.

THE ALJ: Okay, can you hear me okay now?

MS. VU: Yes.

THE ALJ: Okay.

MS. VU: Yes, I do object to this document. It contains hearsay as well as events not in evidence, lack of foundation for some of the statements.

THE ALJ: Okay, I haven't had a chance to read that document. I can attempt to go get that and look through it. Ms. Phillips Polich, you indicated you were trying to use that as a way to help with the follow-up testimony. Is that correct?

MS. PHILLIPS POLICH: Yeah, just to try to streamline this as it's easy for Mr. Callaway to get off topic. It-- this document does contain hearsay and-and Judge, I—certainly-- anything that's hearsay, I would, you know, would go-- I would argue would go to the weight of the evidence and the circumstances. I'm not sure how to better accommodate Mr. Callaway in his situation, so that's really why I'm offering it this way. Mr. Callaway will talk about it if there's something that there's not an appropriate foundation for. I'm really offering it for the timeline component of

Workers'
Compensation Board
Hearings Division

-90-

it in terms of what happened and who he at least documented that he spoke to.

THE ALJ:  Okay.  Ms. Vu, would you be okay with Exhibit 20-- letting me use my judgement with-- in terms of foundation and hearsay and just using Exhibit 20 as a time-- as a reflection of Mr. Callaway's timeline based on the testimony that's about to come out?

MS. VU:  Yes, for purposes of the timeline, but not for the truth or accuracy--

THE ALJ:  Okay.

MS. VU:  -- that document tends to assert.

THE ALJ:  Okay.  Are you okay with that as well, Ms. Phillips Polich?

MS. PHILLIPS POLICH:  I am.

THE ALJ:  Okay.

MS. VU:  But that's not to say that I concede that the timeline is accurate either.

THE ALJ:  Okay.  It's just-- I will-- when I summarize it, I'll say that this is a reflection or-- this is a reflection of Mr. Callaway's view of the timeline of incidents.  Is that okay?

MS. VU:  Yes.

MS. PHILLIPS POLICH:  I think that's-- I think that's a good description and he-- and he's going to talk a little bit about it because I'll tell you, I mean, I had a hard time convincing him to let me offer this as an exhibit because I do think it's helpful for the timeline and how-- versus how long it would take me to get this evidence in by questioning Mr. Callaway directly.

THE ALJ:  Okay.  Great.  I don't have the exhibit in front of me.  Do-- should I go get that Ms. Phillips Polich?

Workers'
Compensation Board
Hearings Division

MS. PHILLIPS POLICH: Yeah, do you want-- Judge, do you want to take just a minute to get a copy?

THE ALJ: Yeah, I think my assistant--

MS. PHILLIPS POLICH: I actually realized I didn't give Mr. Callaway a copy either. I have my own copy.

THE ALJ: Okay.

MS. PHILLIPS POLICH: I didn't make a copy for Justin, so--

THE ALJ: I think my assistant is probably done with lunch now, so I'll go follow up with her, just a moment.

MS. PHILLIPS POLICH: -- okay, all right.

(Off the record)

THE ALJ: We are back on the record. I have Exhibit 20 which is being submitted for the timeline and as we had mentioned previously, I'm not necessarily looking at it for-- or going to be viewing for the truth or accuracy but for the timeline document. Ms. Phillips Polich, are you ready?

MS. PHILLIPS POLICH: Yes.

THE ALJ: Okay.

REDIRECT EXAMINATION

(BY MS. PHILLIPS POLICH:)

Q. Mr. Callaway, I know you know you're still under oath, but I'm just going to remind you. The Judge didn't, but I will. Okay. So, I have offered Exhibit 20, and

Workers' Compensation Board Hearings Division

CALLAWAY -ReD- -92-

you heard me indicate that you were somewhat reluctant for me to offer this exhibit. Can you tell the Judge how-how this document came to be? What the purpose of it was?

A. Yes.

Q. Briefly. Briefly.

A. As the court is aware, I've struggled to find representation. In that process, I went to Disability Rights Oregon, and they were unable to provide representation, but they suggested if I could find somebody to help me create a timeline, that it might be helpful in finding representation. I didn't have anybody available to help me do it, and they offered no one. So, my son-- who PPB did open a criminal investigation into, including with an assistant chief who had a conflict of interest, he was the one who helped me prepare this. It was incredibly difficult as a family for him to have to help me when he knew how triggering this was for me. But you have to realize it impacted our whole family. This is when your employer is a police bureau, and then I'm not going to make generalizations. I think there's more than adequate documentation to show what has happened and what has not happened according to my claim. To have that have relevance in the creation of this document, it was never intended to be shared with anybody other than my personal attorney. So, the language used in this was not meant to be seen. I did not even want to offer it, but I'm trying my hardest to trust-- to have some access to accountability.

Q. Is this timeline that you created here the best recollection that you have of the sequence of events and what you were reporting at work as happening to you?

A. At the time it was created, yes. It was the best that I could create or cocreate with my son. I believe there are other records that exist that document worse or

different things that may be beyond the scope of this claim, but it would be relevant, I would think.

Q. And again, this timeline was intended to-- was the purpose of this time-- this timeline to simply provide a sequence of events of what happened during your employment at the City of Portland while you were working for the-- working for PPB?

MS. VU: Objection.

THE WITNESS: Yes.

MS. VU: Objection, leading.

THE ALJ: Yes, what's the objection? Hello?

MS. PHILLIPS POLICH: Hello. She-- Linh objected that I was leading which I candidly was a little bit.

THE ALJ: Okay.

THE WITNESS: I don't even remember the question, so we're all in the same place.

MS. PHILLIPS POLICH: I'll just try again.

THE ALJ: Go ahead.

MS. PHILLIPS POLICH: I'll try again.

Q. So, what was-- I'm not going to ask that question. I'll just move on to the next question. What-- is this timeline, as you've included this-- have you tried to include as many of the events that occurred during your employment with the Portland-- with PPB-- I always get the initials wrong-- as possible?

A. Yes, and the purpose of creating this timeline was, I was never given any investigation. The only interview that was ever done was the intake interview that I initiated at IPR, which was interrupted, and no follow-up interview was conducted as

should've happened, nor was there even a case number assigned to it. It was specially handled as was every concern I brought up just like when Larry Plant said he would call me the next week and interview me from the beginning of my employment, and then Viki denied my claim. The reason why this timeline exists is because the city made sure that this document did not exist elsewhere.

Q. All right. I'm going to ask you some other questions. I've got to get to the right spot. In the — you heard testimony from your lieutenant, and I know it was a lot. He testified for a long time, so I'm not going to ask you about everything, but I am going to ask you about a few things. When you were employed at the City of Portland, were you transparent about your-- with your employer about your mental illness and limitations?

A. Yes. So, when I was hired, they tried to have me do senior PASS work when I was first hired in the probationary period. I do find the characterizations that the quality of my work or my professionalism all to be mischaracterizations, and I'm sure that if I ever do any discovery or public records request, I would ask for all of the complimentary emails that I had received because of my exemplary professionalism. So, the question you asked, could you restate it? I wanted to-- I really have struggled with the character assassination part of this because I cared about my work and I cared about my employer.

Q. So, my question was, had you been transparent with your supervisors and your employer--

A. Yes.

Q. -- about your mental illness--

A. Yes

Q. -- and your ADHD and--

Workers' Compensation Board Hearings Division

A. Yes. Thank you. So, when I was first hired, I had been misdiagnosed as bipolar, and I was just coming off of that diagnosis and those medications. Antipsychotics are quite-- they're quite brutal to the brain-- and I was coming off of them and I was in tears to captain-- or Lieutenant Gjovik when he was telling me that they wanted me to pick it up and start doing all these other more complicated things. I explained to him that I could do the stuff that I was hired for, and what we did not hear is that the PASS position and the senior PASS position in internal affairs and possibly personnel, are considered the most complicated of any administrative assistant--

MS. VU: Objection lacks foundation.

THE ALJ: Okay.

THE WITNESS: You can yell, like you go and ask for that another time.

THE ALJ: Hey, hey, hey. Hang on a minute. Hang on--

THE WITNESS: No problem. Can I please--

THE ALJ: Hang on-- hang on a moment.

THE WITNESS: -- keep going if-- (unintelligible).

THE ALJ: Hang on a moment. What was the objection? You said objection, foundation?

MS. VU: It was, yes. Lack of foundation.

THE ALJ: With regards to?

MS. VU: In regards to how past positions are considered in a citywide job classification.

THE ALJ: Okay. I will allow it at this time, but I'm going to be searching for the relevant parts as I summarize the testimony in my Opinion and

Workers'
Compensation Board
Hearings Division

Order, but I appreciate you noting that for me.

MS. VU:  Thank you.

THE ALJ:  But I'll let the answer continue.

A.  So, my eyes are closed, so I can't take visual cues from other people here, so that you're aware, so when you interrupt, it's very disruptive for me.  It's not to say that you don't have that right.  I would request if you'd like to interrupt, if you could say the word-- I guess objection is the one you're supposed to use, but give me a minute to finish my thought, because if I don't close my thought, it's very disruptive for me and it's not because I want to keep making testimony that's objectionable, you could strike it.  I don't care, I just need to be able to close my thought and when you interrupt it, it's very problematic for me.  This is like-- why that banjo (phonetic) was not enough.  So, this is a request, please, to just give me-- let me have two sentences to close my thought and then I can go back to it.  So, the relevance to this senior PASS work was they wanted me to do very complicated stuff.  We are under a federal DOJ agreement with quarterly on it, with custom software that was a liability that was never addressed.  These things they know.  Everybody there knows.  Konczal did not deny.  We are here because when I went to that lieutenant, I told him I had-- was misdiagnosed as bipolar, but I had mental illness, and I had ADHD.  These were the known diagnoses at the time.  I was always transparent about my active diagnoses because I wanted to remove the stigma associated with mental illness.

Q.  Excellent, thank you.  All right, when were you first diagnosed with autism?

A.  I only received it-- indicated by my therapist, Heidi Bermeosolo in March of 2023, and I think it was later in the month after one or two of our meetings, I'm not exactly sure, but it was the first time somebody said, Justin, I think you're autistic.  I'd

Workers'
Compensation Board
Hearings Division

had a psych eval that indicated rule out autism. That didn't mean anything to me. And after this workers' comp process and having records that were intended for different purposes, like for FMLA or for ADA, which is a completely different audience than workers' comp, and to misuse my medical records and to know my diagnoses has been very traumatic for me. I cannot open mail. Jodie can attest that I had not opened mail with the exhibits because of what had happened from this process.

Q. All right. So, you learned from part of the process that you were autistic. Did you notify your employer at the time you learned of that diagnosis?

A. I was starting to work through it, and I was very, very selective in who I told. I told Meredith and I hadn't placed accommodations yet. In fact, neither Heidi nor I had ever done ADA accommodations, and the city only provides like a form, which requested what I needed to keep doing my job despite HR telling me they wanted to help me get to a healthy department.

Q. Okay, and I just--

A. And I just want to make a point that the form didn't actually explain how reassignment worked but they indicated that this form could be used for reassignment. I had to go to a third party federally funded website that the city refused to use with accommodations to collaborate called askjan.org (phonetic) to get clarification on even how to use the form for reassignment. I used allotted vacation leave just to figure out an inaccessible ADA process.

MS. PHILLIPS POLICH: Okay. And as Mr. Callaway-- this is Jodie speaking-- Mr. Callaway has had a hard time looking at all the exhibits. I've told him what's in here, Judge, for your understanding that ADA records and that accommodations or requests are in our exhibit packet, and I'm sure Ms. Vu and I

Workers'
Compensation Board
Hearings Division

both will address this during closing, but I want to let you know that those are in the exhibit packet.

Q. So, I want to ask you a couple of questions that hopefully we can answer with pretty short answers. You remembered the lieutenant testifying about the incident with the inmate that was charging and yelling at you, do you remember his testimony about that?

MS. VU: Objection, leading.

THE ALJ: I'm going to allow it.

A. Yes, I do remember that testimony as it was very troubling to me.

Q. Okay. And I'm going to ask you, what time did that incident with this inmate charging and yelling at you occur?

A. It was around 6:40 in the morning and I believe it was on a Tuesday and Sergeant Konczal was the one in the office, not Sergeant Russell, and he was the one I reported it to directly, and I did communicate exactly what happened.

Q. Okay. And-and--

A. And that it wasn't somebody across the street.

Q. -- okay, so I was going to my next question. So, how close to you, to the best of your recollection, was this inmate that was charging and yelling at you?

A. He was within six feet by the time--

MS. VU: Objection, facts not in evidence.

THE WITNESS: What?

MS. PHILLIPS POLICH: Let her--

THE ALJ: Ms. Vu, I appreciate the objection. I will just take note of what he says, and I will address that in my order as best as I can. Go ahead.

THE WITNESS: Could you repeat the objection, so I have some idea--

MS. PHILLIPS POLICH: Her objection was facts not in evidence, but it's okay, the Judge is allowing you to answer the question.

A. Okay. So, the facts as presented were not facts. They were misrepresentations. In fact, there is a video camera there that Sergeant Konczal at the time was well aware that would've documented where it occurred. In fact, I mentioned it and in fact, that footage doesn't show this park. Why would I have cared about the footage if it wasn't relevant? I would not want that footage unless I knew he would've been on the screen. He would've been less than six feet away from me where there was a law where he could've jumped over and smashed my head against a cement wall. There are two doors. There's one door there to the county sheriff's-- to the jail, Multnomah County Sheriff's Office Jail and the other door goes to PPB. In fact, PPB said employees go in that other door. I've gone down there with them before to the very area that I was in is part of how you get between the two spaces, and it's underneath the roof of the Justice Center. There was no across-the-street park thing. This is fabricated and the whole reason-- I can give you a framed-- a screenshot of a visual of what that camera would've shown you as to where he would've been. This is how I would've known it was Randy Graves. If a guy is over a half a block away, I'm not going to know what he looks like. I saw his face because he was running straight at me. He wanted suicide by cop that day. I could not oblige, and I don't even have any self-defense skills. The city knows this. And he was screaming, it's unconstitutional, over and over and he started running at me because I was going in the police door. The Selectron and the safety door are the only things I believe that saved me, and allowed me to be able to go home to see my son who lives with me full time because his mother was abusive to him. So, this was why it was so damaging to me. This door-- the other door, I

Workers'
Compensation Board
Hearings Division

have an injury law claim, I'm sure attorney Vu will share that with the court since they never sent it to me.

Q. All right, we're going to move on to another question.

A. Less than six feet.

Q. Okay. The area where that incident occurred, I think lieutenant-- your lieutenant indicated was where you parked your bike and there was some discussion about the fact that there was a don't park your bike here sign or something to that effect. Why were you parking your bike there and why were you going in that door?

A. So, yes, so we'll go back to the front door. It was boarded up and they actually locked the door to the left. So, if you came in, people exited the right-hand door and I had somebody from chief's office shove the door open right into my wrist-- yes, I still have carpal tunnel in that wrist-- and because you couldn't see if anybody was coming out of the door. So, I did not use that door. That door in that area-- space often had its own safety concerns, but you couldn't see, and then you'd be going into a space. Yes, the city did provide security to other buildings, but they did not provide security to my workplace. And so, I was using the other door because it only had one door I needed to go through. The other doors required a total of one, two, three, maybe four doors to get to park my bike. He seemed to make-- want to make a big deal about-- well actually, there was an officer who had a workers' comp claim named Kim Adams who was assigned to internal affairs. I don't think she was too happy about that process either, and she was the one who I'd once met before when she was an officer. She treated me with dignity, and she also was actually kind of a real compassionate person unlike as represented by Konczal and-- who would yell at me, and here admitted as much. And here, this person went with me down to find a place to park my bike. We went and we talked to the central

Workers'
Compensation Board
Hearings Division

precinct. We asked them about the no parking sign, and I would check in periodically to make sure this wasn't an issue. You can ask Keahu Searle. I don't know how she pronounces her name, but it's K-E-A-H-U I believe or A-U and then, S-E-A-R-L-E. She was the administrator down there in the central precinct. I would always check in regularly because I am actually quite a courteous person and care about my impact with other people, unlike I was presented.

Q. Okay. You also heard the lieutenant indicate that you had a meeting sometime in 2023 where you met and went through one by one with your complaints related to safety or otherwise. Do-do you remember that meeting occurring?

A. I do not recall this meeting ever occurring. He said it included Sergeant Cophang or even a meeting to go over my complaints. That's never occurred.

Q. Okay. Did-- you also heard the lieutenant indicate that he offered to you, on more than one occasion, to file a report or make a formal complaint. Did that happen?

A. That never once occurred. In fact, when I brought up these concerns to Marquis Fudge (phonetic), he told me that it was just bad management training was what he tried to use as an excuse for Konczal's mishandling of my safety concerns. My issue had to do with, we share this building with the sheriff's office, and they were releasing inmates in the bail support fund and yes, somebody got killed from the bail support fund release. This person-- we didn't get to ask Viki about it but-- had attacked two city employees that are park rangers. We didn't ask her if workers' comp claims were filed. So, I know who Randy Graves is. Viki knows who Randy Graves is. Linh knows who Randy Graves is. This is not just somebody who happened to stab some six foot five guy who I saw on my way home after I was told Captain Pashley would work with me to address my workplace safety concerns and

Workers'
Compensation Board
Hearings Division

told me we are not going to talk about that when I saw the person that he stabbed on my bike ride home that day.  This is how nothing was investigated and how it impacts me when nobody does anything, and my HR tells me when I return to work, this is the same HR person who forwarded my ethics complaints to Captain Pashley when I was in the office to engineer this crisis that they're talking about.  Yes--

Q.  When you say the crisis that you're talking about, what is that?

MS. VU:  Jodie can I-- Jodie, can I interrupt your question for a second?

MS. PHILLIPS POLICH:  Sure.

MS. VU:  I understand that objections will disrupt the test-- flow of Mr. Callaway's testimony, but I did want to renew general objections about lack of foundation and hearsay and--

THE WITNESS:  What's the lack of foundation?

THE ALJ:  Hang on, it's not your time to speak.

MS. PHILLIPS POLICH:  Let me be the lawyer and you be the client, please?  Okay?  That's why I'm here.

THE WITNESS:  Yep.

MS. PHILLIPS POLICH:  Okay, go ahead Linh.

MS. VU:  Thank you Jodie, I appreciate that.  But I just want to make it clear on the record that these are objections, but I do understand that they-- to constantly assert them is-- triggers issues for Mr. Callaway.

THE ALJ:  So, you're ongoing objections, I have noted are lack of foundation, hearsay, and I had one more earlier-- just a moment.  I just want to make sure that I address that.

MS. VU:  And relevance.

Workers'
Compensation Board
Hearings Division

THE ALJ: Relevance. Okay. So, I'm listening to the testimony, and I'll try my best to handle those objections through my O and O, if that's okay.

MS. VU: Yes.

MS. PHILLIPS POLICH: And I would just point out that I mean, I objected I think three times during the lieutenant's testimony. I did not object throughout that, and I hope you consider that, Judge, as you weigh this and, in part, I didn't because I knew that at some point I would need the same courtesy back in terms of accommodating Mr. Callaway's neuro-divergent status.

THE ALJ: Yes, that makes sense. I understand.

MS. VU: Yes, and that's what I'm trying.

MS. PHILLIPS POLICH: Okay.

THE ALJ: Thank you.

THE WITNESS: Can I just be clear, are you saying it's hearsay that Marquis Fudge you know was my captain--

THE ALJ: This is not-- excuse me. So, this is the Judge. This is the Judge if you--

MS. PHILLIPS POLICH: No, just-just--

THE ALJ: -- just--

MS. PHILLIPS POLICH: -- what we-- we're just talking lawyer talk about stuff--

THE WITNESS: Okay.

MS. PHILLIPS POLICH: -- that you-- that I'm going to tell you please just--

THE WITNESS: Okay, I'll stay-- I'll try to keep it short.

MS. PHILLIPS POLICH: -- right. I know, so take a minute. Let's take

Workers'
Compensation Board
Hearings Division

CALLAWAY -ReD- -104-

a minute. Take a sip of water, please. Okay?

THE ALJ: All right.

MS. PHILLIPS POLICH: Well, I'm-- he's taking a minute here, so hold on, okay? Can we just take a minute break here, we just need to--

THE ALJ: Yes--

MS. PHILLIPS POLICH: -- regroup, so hold on, okay?

THE ALJ: --(unintelligible). Okay.

MS. PHILLIPS POLICH: All right, I think we have regrouped. Okay.

THE ALJ: Okay, we are--

MS. PHILLIPS POLICH: I'm not sure. Honestly, I think I might've lost my own train of thought there. I honestly don't think I have a lot more. I don't think I have any-- let me just doublecheck my notes here, but I'm not planning on asking a lot more, so, if anything more. I don't think I'm going to ask-- I-I have no further questions, Your Honor.

THE ALJ: Okay. Ms. Vu?

RECROSS EXAMINATION

(BY MS. VU:)

Q. Mr. Callaway, when was this-- the document that your son, Jude, created the timeline-- when was it created?

A. I believe sometime in like February of 2024. I had tried to find workers' comp lawyers and I could not and called the worker's off-- comp office number and they did not care that I can go nonverbal. And I tried contacting the OSB and they said there were no attorneys in my area.

Workers' Compensation Board Hearings Division

CALLAWAY -ReX- -105-

Q. All right, Mr. Callaway, that was my only question for you. Thank you.

THE ALJ: Thank you. Ms. Phillips Polich, anything else?

MS. PHILLIPS POLICH: I don't have anything else.

THE ALJ: All right, thank you. Now, I am okay to do closing arguments based on whichever format you both think is appropriate and I'm also fine to do it now. I'm fine to do it at a later point.

MS. VU: I'm sorry, you broke up for a second there. What was the last sentence?

THE ALJ: I'm fine to do closing arguments in any format you both prefer and at a time that both of you prefer. It could be now. It could be at a later time.

MS. VU: I would prefer, since the testimony was pretty lengthy, I would prefer either written closing arguments or reconvening for closing arguments if you're okay with that, Jodie.

MS. PHILLIPS POLICH: Well, I didn't-- I'll have to explain that to my client. I was hoping to wrap this up today. I was prepared to go forward. I don't--

THE ALJ: I'm fine to go forward today. I'm fine--

MS. PHILLIPS POLICH: Yeah, I prefer to go forward with closing arguments. My client is nodding very strenuously at me.

THE CLAIMANT: This has gone on so long and it's not been fair to me because I can't find a lawyer. I don't receive taxpayer funds.

THE ALJ: Thank you, okay.

MS. PHILLIPS POLICH: It's okay. It's okay. Good job.

THE ALJ: Thank you. All right.

MS. VU: I'm prepared to go--

Workers'
Compensation Board
Hearings Division

CALLAWAY -ReX- -106-

MS. PHILLIPS POLICH:  They believed me when I said that you were nodding your head strenuously--

THE CLAIMANT:  Okay.

MS. PHILLIPS POLICH:  -- that you'd like to proceed forward.

THE ALJ:  We-- I--

MS. PHILLIPS POLICH:  Even though they can't see me, they know that, okay?

THE ALJ:  -- we believe you, Mr. Callaway.  I just wanted to make sure that everyone was okay to go forward today.  So, if they are, I'm happy to proceed.  Ms. Vu, are you ready?

MS. VU:  Yes.

THE ALJ:  Okay.  Go ahead, Ms. Phillips Polich.

MS. PHILLIPS POLICH:  All right, thank you.  Judge, we did do openings and we're doing closings today.  So, as I indicated in my opening remarks, Mr. Callaway must show that the employment conditions producing the mental disorder exists in a real and objective sense.  This record and the testimony that you heard today, including the testimony of the-- of the lieutenant whose last name I am not going to butcher through this whole thing.  Mr. Callaway's trying to write it out for me phonetically, Konczala?

THE CLAIMANT:  It's just Konczal.

MS. PHILLIPS POLICH:  Konczla.

THE CLAIMANT:  Konczal.

MS. PHILLIPS POLICH:  Konczal.  Okay, Konczal.

THE CLAIMANT:  Yeah.

MS. PHILLIPS POLICH:  So-- and Lieutenant Konczal actually

established that the events causing Mr. Callaway's mental health disorder exists in a real and objective sense in terms of how that is perceived under ORS-- and interpreted under ORS 656.802. The-- I would cite you to the case of *Rory*, R-O-R-Y *S. Lewno*, which is L-E-W-N-O, 66 Van Natta 2075 (2014) case, and the Board in that case stated that the focus is correctly on the worker's perception. In this case, Mr. Callaway's perception-- being based on real as opposed to imagined events. What we heard both from Mr. Callaway in terms of the transcribed statements and the review of the timeline, and the lieutenant's testimony is that we know we had real events that happened in this workplace. And the Board goes on in the *Rory Lewno* case to state that they assumed that they-- Claimant's perception were based on real and not imagined events. Here, we don't even have to go that-that far as we know that the lieutenant affirmed that the events that serve as the basis of this claim did indeed occur. We-- the Board in the *Rory Lewno* case also states that they could assume without deciding that Claimant's concerns in that case-- for his safety, were not employment conditions that are generally inherent in every working situation. And I would assert, Your Honor, that that's consistent with a-- with a more recent Court of Appeals decision, which is *Kuralt v. SAIF*, and I forgot to write down the cite, but *Kuralt v. SAIF*, where the court addressed the meaning of the worker's subjective beliefs in the context of a good cause analysis.

And how that pertains, Your Honor, is that the court explains there that-- we said that in that case that a worker's subjective beliefs must be induced by some actual occurrence which is susceptible to such an interpretation by him, and that's at Page 44-- 441 of the *Kuralt* decision. And the court goes on to say that what we meant by that statement is that the worker's subjective belief must be objectively reasonable even if the worker-worker's subjective belief that the worker

Workers'
Compensation Board
Hearings Division

CLOSING ARGUMENTS  -108-

will be laid-- in that case the worker was being laid off-- but they said that the worker would be laid off is based on an actual occurrence from which the worker reasonably could conclude that the worker would be laid off, then the worker has established good cause. And in this case-- that case, the court said that the Board had found that the Claimant had a subjective belief that he would be laid off based on a conversation that he had with the employer's comptroller. That conversation was an actual occurrence and that's at Page 483 of that decision.

Here, Mr. Callaway asserts that a similar analysis applies to assessment of whether the employment conditions exist in a real and objective sense as required by ORS 656.802(3)(A). We don't have a reasonable worker requirement in 656.802(3)(A) as we do in sort of the good cause standard that we apply in workers' compensation. Instead, when it relates to mental health claims, it is whether Mr. Callaway's perception is reasonable in response to real events. The factfinder, you, cannot assess that, and you can't-- your judgement about the reasonableness of the employment action for that of Mr. Callaway because the medical effect of the events, is measured by the actual reaction rather than by an objective standard of whether the conditions would've caused disability of an average worker. And this is very important, Your Honor. That's stems back to quite an old case. It's the *Peterson v. SAIF*, and Peterson is P-E-T-E-R-S-O-N, *v. SAIF,* 78 Or App 167 and if you specifically take a look at Page 170, review is denied by the Supreme Court 301 OR 193 and that's a 1986 case.

The issue in *Peterson* was whether Claimant's perception of overwork was accurate, and the court found that the correct question to be posed is not whether there was stress causing pressures on that worker's job that were real and they were not to be judged by a standard of what would constitute overwork to the

average person on her job. And in-- that we have to look at whether or not the events were real, not-- and again, this is affirming that there is no average person or average response. In *Peterson,* the issue in that case was whether the preexisting condition was a significant level of interpersonal dysfunction as indicated by history in that particular case of six marriages, and that this predisposition to psychiatric symptoms was a major contributing cause of her difficulty. Basically, that she was predisposed to psychological problems-- and I'm sort of anticipating some of the arguments that Ms. Vu will make, but here in this particular case, the court's rationale is stated in the reverse to this case, and-and the court stated here, even if Claimant's reaction to the real events of a new city manager and changed work duties was psychotic-- and that is the word the court uses, her condition would still be compensable if she was reacting subjectively to real, potentially stress-causing events.

Here, Mr. Callaway's reaction was to real workplace incidents that-that caused him to be fearful of his safety and it's not a reaction to imaginary conditions just like Ms. Peterson. These were real events to which he had a real response. In fact, his response was so real that Mr. Callaway told anybody, and anybody who would listen. I mean, you heard the lieutenant's testimony that Mr. Callaway could go on at length to the point I would say-- that he used perhaps a different word-- but to the point of irritation. And-and again, this record also reflects Mr. Callaway is neurodivergent and that is part of his disability. And clearly that is part of it here and I certainly would like to think that while neurodivergent is not-- did not rise to the level of being psychotic, that does not prevent Mr. Callaway's claim from being compensable simply because he's neurodivergent with a diagnosis of both ADHD and autism.

Workers'
Compensation Board
Hearings Division

CLOSING ARGUMENTS -110-

And I don't think there's any point in sort of avoiding the-the real issues in the room, and those are the real issues in this room. They've been the real issues in terms of what happened throughout Mr. Callaway's entire employment with the City of Portland. However, that's not what's at issue. What's at issue in this particular case really is whether or not that-that Mr. Callaway had events that caused him to have real safety concerns that were never addressed by his employer. And I think clearly what we heard from the lieutenant was that-- that he had these safety concerns and, according to the lieutenant, none of those were a problem and they weren't even real safety concerns including COVID which is as we know killed millions of people worldwide. So, I'm not sure that we want to rely on Mr.-- on the lieutenant's assessment of whether something was or wasn't a safety concern. In terms of when you listen to his testimony, what he talked a lot about was whether or not there was a crime and whether or not it would rise to the level of being prosecuted. That isn't the basis of this particular claim nor is that how-how the-- I guess the-the legal system works. This is about keeping-- whether or not Mr. Callaway felt safe in his workplace, felt that his safety concerns were being taken seriously. They weren't. And that's what you really heard from the lieutenant in his testimony. Yes, he listened to him, but he didn't do anything. Nobody did anything. They didn't even investigate. They investigated one of many complaints and that was it. We don't have documents of that. We don't have a case number and all of that is-is and has been distressing to Mr. Callaway and is a large part why we're here.

And I want to talk a little bit more about this worker's perception. There's another case called *SAIF v. Shilling*, 66 Or App 600 (1984) case. And again, this is a case where overwork was at issue. And here what the court said is,

the question is not whether Claimant's perception of overwork was accurate, or whether Claimant was overworked as judged by a standard of what would constitute overwork to the average person on her job. The question is whether there were stress-causing pressures on her job that were real. In applying the standards expressed in *McGarrah* and *James*, (phonetic), we conclude that the cause of the Claimant's on the job stress are the kind that do not preclude a claim based on the resulting mental condition. As we noted in our previous opinion of this case, Claimant was frequently required to tend the office alone, contend with long lines of people waiting for assistance, and often had to work through her morning and afternoon breaks and sometimes into her lunch hour. These are real pressures and Claimant's reactions to them were not reactions to mere imaginary conditions. That she was more susceptible to the conditions than others might be, that she characterized them as overwork when someone else would not have, or that they were more stressful for her did not preclude her claim. And I think that the direction that-that the court gives us in *SAIF v. Shilling* is important to look at. These are long cases that've been around for a long time, and while some of our standards for mental health conditions have changed since then, not these underlying perceptions-- not these underlying, I guess, precepts for what the law is based on. We've increased the evidentiary standard, but not what can serve as the basis of the claim.

In terms of assessing Mr. Callaway's perception, Mr. Callaway's perception is demonstrated by the medical effect as supported by the medical evidence is what dictates the factual findings regarding the employment conditions. And essentially, once the-the employment conditions are determined to exist in a real and objective sense, then there-- then under 656.802(3), we've met that first

Workers' Compensation Board Hearings Division

CLOSING ARGUMENTS  -112-

standard. And then, the next part we look at here is the medical evidence. And here what we see is uncontradicted medical evidence, and I'm going to talk about that in just a moment. But I want to address something that I do anticipate at least as part of the city's response to this, but what we see here, Your Honor, is a relatively limited exhibit packet for this type of litigation, and to the extent this record is devoid of any corroborative evidence of Mr. Callaway's concerns about his safety, that stems in large part from the City of Portland's failure or the Portland Police Bureau's failure to follow its own rules and investigate Mr. Callaway's complaints.

And so, that absence of investigation is very important here, and it's failed-- and its failure to follow its own rules and investigate these concerns of Mr. Callaway is really at the heart of Mr. Callaway's claim here. Each and every time that Mr. Callaway expressed a concern about his safety to his supervisor, the lieutenant to the captain, and to every other person that he worked with, and his efforts to obtain help from HR and IPR and all these other people, it was all in an effort to obtain help. And each and every time he did that, Your Honor, he was retraumatized, and this really did at some point lead to where he files for a workers' compensation claim. And that's what got him to this place. It took a while to work through this process. You know, it doesn't really-- we can laying blame for whether there-- whether who should've helped Mr.-- if there was somebody who could've or should've helped Mr. Callaway navigate this process, clearly it took a long time, and he did a lot of it on his own. I think that when-- and I think that's reflected in not only the evidentiary record but, in the testimony, we heard from the lieutenant. We heard that this-- that Mr. Callaway's concerns escalated. They escalated because they were traumatizing. That's exactly what's at the heart of this particular case. And in terms of the-- and I want to-- I'm stressing this a little bit, Your Honor, because the

Workers'
Compensation Board
Hearings Division

CLOSING ARGUMENTS -113-

second hurdle that we must overcome or-- I say overcome, is whether or not-- this generally inherent hurdle. And it is usually the most difficult and challenging of the hurdles for the injured worker. And you, as the factfinder, must sort the identified events into categories and determine whether or not the employment factors are essentially at the heart of this claim. Here, Ms. Bisby attempted to do your job for you but is-- by deciding based on her limited-- and I would argue, inadequate investigation, that the City of Portland's disregard of Mr. Callaway's safety concerns were generally inherent in today's world. I respectfully disagree, and this would make all commonplace bad behaviors such as sexual--

MS. VU: Jodie you cut out for about (unintelligible) seconds.

THE ALJ: I was able to hear, but go ahead--

MS. PHILLIPS POLICH: Oh okay, I--

THE ALJ: -- go ahead. Go back.

MS. PHILLIPS POLICH: -- Okay. So, as I said, here Ms. Bisby attempted to do your job, Your Honor, for you by deciding, based on her limited and inadequate investigation, that the City of Portland's disregard of Mr. Callaway's safety concerns were generally inherent in today's world. I respectfully disagree as this would make all commonplace bad behavior, such as sexual harassment and bullying generally inherent. I don't think that having people attack you on the streets is generally inherent in the workplace. I don't think that having inmates released outside the entrance to my employment is generally inherent, and I would assert that-that it isn't here. Oregon law requires that all employers provide their workers with a safe workplace. The name of that law is called the Employer's Liability Law. It is codified at ORS 654.010. That law requires employers and those in charge of work to use every practical device, care and precaution to protect the safety of

Workers'
Compensation Board
Hearings Division

employees. The City of Portland blatantly disregarded Mr. Callaway's safety concerns and failed to provide a safe place of employment to protect his life, safety, and health as is required by ORS 654.010. This-- we have an exclusive remedy system, that this law is part of why we have an exclusive remedy system where your remedy is against your employers because of the balance of the employer liability law, which requires and expects employers to provide their workers with a safe workplace. The fact that the lieutenant testifies that he couldn't fix these problems doesn't change the fact that he had an obligation to provide a safe workplace.

In terms of determining the categories and whether an employment condition is generally inherent, I'm just going to cite you generally to the case of *Havlick v. Patelco* [sic] which is 164 Or App 522 (1999) case and there the court talks about that whether a stress producing condition is common to the full range of employment depends in large part on how the stress producer is defined. And it talks there about the importance of defining the category appropriately to be not too broad and not too narrow as to preclude compensability and the court-- the *Whitlock v. Klamath County School District,* case discusses that at well-- as well and that's at 158 Or App 464 (1999) case.

The City of Portland here asserts that Mr. Callaway's claim is not compensable. It's based on Ms. Bisby's testimony because what happened to him was not generally inherent, and I would assert that-that it is not generally inherent. We are all entitled, as a matter of law, to a safe workplace. The City of Portland failed to fulfill its legal obligation to Mr. Callaway under the Oregon Employer-- Oregon's Employment-- Employer Liability law and, as such, it disregarded Mr. Callaway's safety concerns, is not generally inherent in the workplace. The third factor here is whether there's a diagnosis of a mental or emotional disorder which is

Workers' Compensation Board Hearings Division

generally recognized in the medical or psychological community. This record contains reports from two different providers in this record, both of whom have treated Mr. Callaway. There's Exhibit 17, which is from his current mental health provider, Licensed-- the LPC, Don Marr and that's at Exhibit 17 and then we have a similar opinion from LPC Heidi Bermeosolo, Exhibit 18, which confirms that we have a diagnosis of chronic or complex PTSD, that it-- that it is generally recognized in the medical psychological community and that the major contributing cause are the safety complains-complaints that have been disregarded by the City of Portland as demonstrated by this record. There's no countervailing medical opinion, so that step of this particular claim is relatively easy.

The last step that must be overcome as it relates to the compensability component is whether there's clear and convincing evidence that the mental disorder arose out of and in the course of employment. And this is ultimately a fact question that you must answer based on the strength of the evidence, both testimonial and medical presented today. I would assert that Mr. Callaway asserts that he has met this standard by establishing that the events that occurred in his workplace were real and objective and that his response to these particular safety-- disregard for his safety did result in him developing complex PTSD, and that-that the medical evidence supports this, and that there is clear and convincing evidence that his PTSD specifically is clear-- arose out of his employment here to a clear and convincing standard.

The key exhibits as it relates to compensability here, I would assert are Exhibit 16, which is the confidential recorded interview transcript, the medical opinions of Don Marr and Heidi Bermeosolo, both Exhibits 17 and 18, and then also the timeline.

Workers'
Compensation Board
Hearings Division

In the-- so, I'm going to-- I'm going to circle back and address attorney fees at the end of this. In terms of my closing argument as it relates to compensability, that's what I have for now.

One of the other issues that I had-- that has been raised in this particular case is penalties, and-and I have asserted that the City of Portland's October 13, 2023, denial is unreasonable, which arises here to the unreasonable resistance to compensation or refusal to pay compensation due to the fact that the City of Portland has failed to conduct a reasonable investigation before denying the claim. I'll pick a case where you're familiar with, Your Honor, *International Paper Company v. Huntley*, 106 Or App 107(1991) case identifies the standard here as-as being whether from a legal standpoint the carrier had a legitimate doubt as to its liability. *Brown v Argonaut Insurance Company*, 93 Or App 588 (1988) case states that unreasonable and legitimate doubt are to be considered in light of all evidence available at the time of the denial. ORS 656.262(1) specifically states the processing of claims and providing compensation for a worker shall be the responsibility of the insurer or self-insured employer. We know that ORS 656.262(14) talks about a worker's obligation to cooperate and assist in the investigation of their claim, which really focuses on the fundamental need for the insurer or employer to obtain a statement from the worker about the basis of their claim. And I think the importance of the insurer's obligation to process claims is affirmed by the Board in the recent case of *Luis Nava*, 74 Van Natta 372 (2022) case that talks about the importance of the insurer's obligation to process claims-- in that case, specifically modifying the Notice of Acceptance and, in that case, it held that the be-- modifying the Notice of Acceptance consistent with the ever developing medical evidence in a claim that's already accepted. Here, the information available

Workers'
Compensation Board
Hearings Division

to the City of Portland at the time of its denial established the compensability of Mr. Callaway's PTSD claim as there was no contrary medical evidence in the record. And I would cite you to the case of *Jeremy,* J-E-R-E-M-E-Y *[sic] Veelle,* V-E-E-L-L-E, 72 Van Natta 894, specifically at Page 902, (2020) case that talks about evaluating the evidence at that time.

The administrative rule that dictates what a reasonable investigation looks like is OAR 436-060-0140(1) and it states that an insurer is required to conduct a reasonable investigation based on all available information in determining whether to deny a claim. And that means, whatever steps a reasonably prudent person with knowledge of the legal standards for determining compensability would take in a good faith effort to ascertain the facts underlying the claim given due consideration to the cost of the investigation and the likely value of the claim. And the-the administrative rule specifically states that you only look at whether the information contained in the insurer's claim record at the time of the denial, and that the insurer may not rely on any facts not documented in the claim record at the time of denial to establish that an investigation was reasonable.

And Your Honor, that's in part why I had went through the somewhat of the tedium of asking Ms. Bisby to read what was in her record and when it-- when it went into the record because that's a very important standard. I also asked Ms. Bisby some questions about what she normally did, and the bottom line here is that-that Ms. Bisby didn't follow administrative rule 436-060-0140 and there was a case that's actually-- it's been a while since I've read this case, but now you'll have the opportunity to review it as well called *Hobby,* H-O-B-B *[sic], L. Brooks,* 73 Van Natta 494 (2021) case, and I would assert it's dispositive of this issue regarding what is considered a reasonable investigation here, and when you take a look at that case,

you'll see what the Board discusses there and they talk about the fact that a statement, obtaining records, and all of those things, are a critical part to conducting a reasonable investigation. And here, there's just an absence of anything resembling a reasonable investigation. In fact, after Ms. Bisby's testimony, I'm not even sure that at the time that Ms. Bisby was speaking to Mr. Callaway on the phone, that he'd even filed the 801 claim form because she's talking to him about getting him the 801 claim form. So, that can't be investigating-- you can't have a statement or investigate a claim before a claim is filed. And so, I think that is a very important component here.

The other thing is, while her notes do-- and I have no reason to question Ms. Bisby looking at her claim notes, but she testified that she spoke with the lieutenant in-- I think in August-- or October 6, 2023, and the lieutenant doesn't remember speaking with her until sometime in 2024. And in terms of the lieutenant's testimony, I haven't made any comments about that other than-- I would say that I think the fact that he was off about when he actually spoke to Ms. Bisby about this is perhaps indicative of what else he might be off of in his testimony. He testified from memory, indicated he didn't review any documents prior to this, hadn't looked at this matter for over a year prior to testifying today, that he had only kind of read the transcribed statement that's Exhibit 15 in our record in preparation for his testimony today, and he testified for I think-- I didn't time him, but close to two hours from memory of events that occurred more than-- many of these events occurring more than-- back in 2019 to the present over five years ago, and in a substantial amount of detail, and I would just question the accuracy of his memory-- the accuracy of his-- of that detail, simply by looking at how off he was as it related to when he spoke with Ms. Bisby about Mr. Callaway's claim generally.

Workers'
Compensation Board
Hearings Division

Your Honor, I want to circle back to the attorney fee issue in this case. I do think that-- as it relates to the penalty issue, that there-- really here is an absence of anything resembling a reasonable investigation which justifies the maximum penalty allowed of 25 percent on any amounts then due as well as the maximum attorney fee of $5,973.00. Should you find this claim compensable, Your Honor, I would assert that the appropriate attorney fee in this particular case-- and let me get back to my notes on that, is $40,000.00. I will cite you to the case of *Rachel Bonine,* B-O-N-I-N-E, 75 Van Natta 2023-- and it's also a 2023 case assuming I did not make a typo, which is a possibility, but I know it's *Rachel Bonine* since it's my case, Your Honor. And in that case, the Board awarded a $35,000.00 attorney fee, and that's been several years since then, and I'm going to talk with you a little bit about why I think an increase above that fee is appropriate. Mr. Callaway generally is asking that his attorney be awarded an attorney fee consistent with the efforts demonstrated throughout the course of this hearing. Your Honor, I agreed to take on this claim knowing that the City of Portland would be objecting to a postponement which resulted in me having about-- a very short amount of time, about a week, to prepare this matter for hearing. I also ask that you consider my former tenure as a Board member, my 30 plus years of experience specializing in workers' compensation law, and being one of only a few attorneys who will take on mental health claims in our forum. I think that this absence of attorneys doing this work is well reflected by Mr. Callaway's challenges in finding representation, creating multiple resets in this matter.

One of the reasons why attorneys do not take on these cases is because the fees are not commensurate with either the time or effort expended. Despite that fact, I continue to take on meritorious claims such as Mr. Callaway

because workers need to have representation in these types of claims to have a fighting chance. As you know, the legislature in 2015 passed legislation increasing attorney fees to ensure ongoing access to representation to injured work-workers related to workers' compensation claims. The Board is charged with awarding fees consistent with this purpose. According to Bulletin 111, since 2015, the average weekly wage in Oregon has gone up over 50% with last year's increase being 6.427%. Unfortunately, while fees have gone up since this legislation, they still have not kept pace with the rise in Oregon's average weekly wage. In this case, should Mr. Callaway prevail, I believe a fee of $40,000.00 is appropriate. I win approximately one out for four stress cases that I litigate so considering-considering the risk and the time away from other cases, I think a fee that double an average case is appropriate. As I indicated, in order for you to reach this particular point in your decision making, Mr. Callaway must prevail. I make this attorney fee argument at the end of my argument because my fee is far less important than the decision on the merits. Mr. Callaway is what matters. This process is for workers, not attorneys.

If you find the claim compen-compensable and competent, you can determine what is a reasonable attorney fee based on the arguments that have been presented to you keeping in mind the difficulties presented in this case in terms of Mr. Callaway's neur-neurodivergent status as well as the short time between my representation in this hearing and-and including the significant benefits that are at issue here as-as it's clear from this record Mr. Callaway's been unable to return-- is no longer at his job at the City of Portland. Again, I would assert that Mr. Callaway has met his burden of proof on each of the requisite criteria sufficient to establish the compensability of his claim and that the record is sufficient to find that Mr. Callaway has met his burden of proof under ORS 656.802 and Mr. Callaway is seeking and

Workers'
Compensation Board
Hearings Division

order setting aside the City of Portland's October 13, 2023, denial along with an aware of assessed attorney fees and costs should he prevail as well as penalties that I previously argued consistent with the argument presented today. Thank you.

THE ALJ: Thank you. Ms. Vu. Ms. Vu, you might be muted.

MS. VU: Oh, sorry about that. Yes, I was muted, sorry. My closing is relatively simple. You know, Ms. Phillips Polich went through the requirements under 656.802(3). We have a long list of complaints that Mr. Callaway submitted to his supervisor, Lieutenant Konczal. The majority of those complaints were either incidents that were not work related, but were conflated with PPB's function as a law enforcement agency, not its function as an employer.

In regard to sub A, is the requirement that employment conditions producing the mental disorder exists in a real and objective sense. We have the one incident that Mr. Callaway complained about where a person-- now-now here we have a divergence as to what actually happened, right? Just because Mr.-- well, first of all, what I will say is that the story has changed from when Mr.-- according to Lieutenant Konczal's testimony-- Mr. Callaway's story changed significantly from when he first started talking about this incident, and when Lieutenant Konczal made great efforts to figure out with Mr. Callaway what exactly happened, and what could be done about it. So, we know that the-- Mr. Callaway's version of this event has changed throughout time and so we come to the IPR, the independent police review, statement which Mr.-- which the lieutenant testified that the IPR is an independent police oversight agency that is not connected with PPB.

We come to this investigation, this statement that Mr. Callaway gives to IPR, stating that, you know-- and you can see from the statement that he's now stating things like this person actually has an identity. He thinks it's this person

Workers'
Compensation Board
Hearings Division

named Randy Graves, that this person wanted to commit suicide by cop. None of this information was ever discussed until we now see it in this IPR transcript.

In regards to some of the other complaints again, we see that they are either incidents that are not work related, were not in the course of scope of work, or are generally inherent in the workplace. For instance, and this-- and this I'll get to-- I'll circle back to this too when I talk about penalties and attorney's fees. Ms. Bisby understood from talking with Mr. Callaway that he was having difficulty with the FMLA process, with the ADA process. He was running out of leads. He was upset because his application to become a senior PASS had been rejected. He-- other testimony from the lieutenant that he was having-- and then in the documentary evidence as well-- he was having difficulty obtaining EAP assistance for himself and for his son. Again, stressors that are outside of work or were-- or conditions that are generally inherent in every work situation.

We come to sub letter C of the diagnosis of a mental or emotional disorder is generally recognized in the medical or psychological community. Both the opinions from the providers-- or from LPCs which stands for licensed professional counselors, they are not psychologists or psychologists. They're therapists. I would submit that they are not qualified to make a psychiatric or psychological diagnosis. In addition, their reports don't discuss the diagnostic criteria for PTSD, and you will see that at least with Ms. Bermeosolo's paperwork that she filled out on behalf of Mr. Callaway from first FMLA leave-- she characterized the diagnosis of PTSD as chronic or preexisting.

The last letter D, clear and convincing evidence that the mental disorder arose out of and in the course of employment and this also goes to the persuasiveness of the medical reports. We've heard testimony from the lieutenant

Workers'
Compensation Board
Hearings Division

that Mr. Callaway had-had experiences outside of work. For instance, he confronted burglars in his neighbor's yard in the middle of the night. He was in a physical altercation that resulted in having a plate in his head. Mr. Callaway, during his testimony, did not refute either of these and I would submit that this information would be significant for a provider to take into account when rendering an opinion.

As to the penalty-- excuse me-- as to the penalty issue and the-- and this also goes to Ms. Phillips Polich's statement about the persuasiveness of the lieutenant's testimony, Ms. Bisby read from her notes regarding her conversation with Lieutenant Konczal which was-- according to Ms. Bisby's testimony, was in-- sorry, now I'm checking my notes for the exact date because I do not want to mis- misspeak-- that it was October 6, 2023. Ms. Bisby read her notes from her conversation with Lieutenant Konczal that was completely consistent with the testimony that he provided today. I think that supports that the lieutenant's recollection of the events again is consistent. He's provided the same information to Ms. Bisby, and he's provided the same information testifying under oath today. This supports Ms. Bisby's decision to issue a denial on this claim. That there was legitimate doubt because again, she was basing her decision on the exact same information the city is presenting today through testimony from Lieutenant Konczal as well as with her conversations with additional city representatives including human resources and the PPB's FMLA coordinator.

Finally, I don't question Ms. Polich's—Phillips Polich's credentials, but I do assert that $40,000.00 as an attorney fee is excessive. We only found out yesterday that Ms. Polich was representing the Claimant. Again, I don't know how much time between yesterday and today Ms. Polich would've spent on this case, but I do know that I did not receive a letter of rep until yesterday afternoon at some

Workers' Compensation Board Hearings Division

point. Ms. Polich—Phillips Polich says she has prevailed on one of four stress cases. I don't know that that's-- I don't think that's relevant in the sense that-- I'm not sure what her record, how that adds to the relevancy of the attorney fee, but I just want to take notice that Ms. Phillips Polich also said that she did not ask for a postponement but again, nothing was stopping her from doing that in order to allow herself more time to prepare. It would've been up to you, Your Honor, to make that decision, but I don't believe that Ms. Phillips Polich actually took that step to request a postponement. All right, Your Honor, I think that concludes my remarks. I appreciate your time.

THE ALJ: Thank you. Ms. Phillips Polich.

MS. PHILLIPS POLICH: Well, I think I'll just start with the attorney fee first. So, while Ms. Vu is correct that I provided my notice of rep yesterday, I think it would be clear from the medical records that the concurrence letters are-- that are in here, that I started working on this case last week, and I'm not quite sure and since I've never really had a defense attorney argue such as this, but Ms. Vu did eliminate from this-- and certainly it's argument, but I did contact Ms. Vu last week and was told that the city would object to a postponement, and that was a significant consideration in terms of whether I agreed to represent Mr. Callaway. And so-- and also, I've been talking to Mr. Callaway for weeks prior-- several weeks prior to that, so you can't just look and say what did I do from yesterday-- from when you got my notice of rep to today. And quite candidly, I spent a significant part of my weekend working on this case. So, I spent a lot of time. I don't track my time mostly because I'd probably find it super depressing. So, I don't. I'm representing Mr. Callaway because I think he's-- first he's an injured worker. All injured workers are deserving of representation and certainly in a case such as this.

Workers'
Compensation Board
Hearings Division

Again, we heard testimony from Mr. Callaway's lieutenant for close to two hours and I think based on prior-- my understanding of prior proceedings in this matter, that without my assistance today, this hearing would not have been able to proceed forward and I think that that is of substantial benefit not only to Mr. Callaway but the system and I think that that needs to be taken into consideration in terms of evaluating the attorney fee. I certainly have no reason to lie about my statistics as it relates to the win/loss ratio when one litigates these cases. These are-- the reason I mentioned that is because it demonstrates the difficulty of these cases in terms of litigating them. And so, when I am successful in litigating one of those cases, I'm entitled to be paid appropriately for those efforts.

As I indicated, honestly, my attorney fee isn't what this is about. This is about Mr. Callaway and about Mr. Callaway having representation at this hearing. I'm facilitating the-- facilitating this forum with being able to make a decision about compensability. We talk a lot in our-- in-- not only in this-- in our agency, but as workers' compensation attorneys about access to justice. Access to justice is about workers getting to lawyers. That's what it's about and lawyers get paid. That's the bottom line. And so, in order for this forum to have workers who are represented then this forum needs to ensure that counsel is appropriately paid for-for their efforts in representing injured workers. So, enough on my high horse about that.

I'd like that we go to the merits of Ms. Vu's argument. I'd like to start with the-- that this claim is based on a long list of complaints. That's not true. The reason the city might not have known what this complaint was based on is because the City of Portland made a decision to not take Mr. Callaway's statement. You didn't hear anything from Ms. Vu about-about how the City of Portland complied with the administrative rules, or how they did anything. There's just no way around how

can reasonable investigations not include taking a recorded statement of the worker. Yes, she spoke to Mr. Callaway but there's no indication that that was a statement. There's no indication the claim was filed at the time she spoke with Mr. Callaway. Is it enough to talk with the lieutenant? I don't think so and more importantly, the administrative rules don't think so and the-- and the case law doesn't think so. And to sit here today and argue that the recorded transcript that was submitted by-- that was taken by IPR-- the reason why they don't know the basis of this claim is because they failed to take a statement. This claim isn't about a long list of complaints. Yes, it's got a list of complaints that Mr. Callaway has made, that's true, but those long list of complaints aren't what led to his being diagnosed with PTSD, chronic, complex, however you want to label it. There's no indication-- there's not a single medical record in this file showing that there is any mental health treatment prior to this particular-- to the-the records we have in here which are associated with the filing of this claim. There's no indication of any kind. Again? Why? First, we don't have-- we didn't hear testimony from Mr. Callaway-- I'm not asserting that those are out there-- but to the extent there would be, the city wouldn't know because they never took a statement from Mr. Callaway to know what-- where he did and who he did get treatment with. The only thing they did was, what, a year later, when MODA is sending them some inquiry about whether or not the bill should be paid. So, to ar-- to sit here today and argue that they don't know what the basis of this claim is, is ridiculous.

And in terms of the-- that somehow that the investigation is reasonable because it's what the city relied on today in terms of presenting this case, I'm-- Your Honor, you heard the lieutenant's testimony. You heard Ms. Bisby read what her summary was. I'm not going to say that the summary isn't relatively accurate, but

Workers'
Compensation Board
Hearings Division

candidly, it's just not believable or credible to me that the lieutenant can testify from memory without looking at a single document about events in the level of detail that he did. And even when he was testifying, he was contradicting himself. Sometimes he'd say it was a few days. Sometimes he'd say it was a few weeks. He really didn't know the timeline. And to remember all those conversations and candidly, there is some differences. You know, he said that he sat down and went step by step through this. He didn't. Mr. Callaway says he didn't. And there would be documentation if he did. You know, honestly, I'm usually sitting in the place where I have to go-- where I listen to the defense lawyer go, there's no corroborative evidence. That isn't what we have here. I have so much corroborative evidence from the lieutenant about Mr. Callaway's complaints that I-- you know, I certainly didn't want to interrupt Mr.-- the lieutenant from his testimony because he-he clearly states and corroborates the entire basis of this com-- of this claim.

And it doesn't matter that there's all these other things that are happening. There's no medical opinion that says that the burglary of the neighbor's yard or some other event is at the heart of this. That's why those opinions are in there. This is about what was happening in the workplace. And I would like to comment in terms of the plate in the head, Mr. Callaway didn't-didn't contradict that testimony. I would tell you that the lieutenant did note that Mr. Callaway is deaf. Mr. Callaway has a cochlear implant which is a plate in his head. So, there's no evidence in this record that there's any-- been any physical altercation, no investigative report, nothing indicating that this is an individual who sustained some kind of head injury or altercation and certainly nothing in this timeframe.

Really, these types of arguments are somewhat surprising to me, but there is no contradictory medical evidence in this record. There's no indication that

Workers'
Compensation Board
Hearings Division

chronic means preexisting and Ms. Vu's comments are simply that, comments, and argument. Certainly, the medical evidence one would sometimes call conclusory but it's sufficient in this case. There is no countervailing medical evidence. These are long-time medical providers who clearly-- and Mr. Callaway indicated he talked about all these concerns with. They know what's going on with him. Simply, the nature of Mr. Callaway's neurodivergency, there's no question that they know what's going on with Mr. Callaway. That in essence is what the lieutenant told us, the reality was everybody knew, and everybody knew and the person who did nothing was his employer. That's why we're here. We're here and the city doesn't know what this claim was about is because they didn't take a statement. They didn't get medical records. They didn't listen to Mr. Callaway and today was about Mr. Callaway being heard and-and my job today was to try to make sure that he had a voice in this proceeding, to be his voice and to do my best to present-- help him present his case considering his neurodivergent status which definitely was challenging and in a relatively short timeframe and I hope that the forum appreciates his effort in terms of-of that and I appreciate the forum's accommodation in terms of giving me some leeway in terms of putting on Mr. Callaway's testimony.

And now I'm going to take a short break and read the notes that Mr. Callaway-- to see if I have anything else that I want to add to my remarks, so-- hold on one second. So, Mr. Callaway would like me to be sure and add that-that all the way from the beginning to the end of this, this has been about a lack of investigation into the complaints, a lack of investigating these complaints. We can see that in this record starting with hearing the lieutenant's testimony about him bringing these issues and his concerns. We see this even in the IPRs transcript where they say that we're going to follow up. They don't follow up. There's no evidence of follow

up. Nobody followed up. He gets to file a workers' compensation claim and-and he's told he's going to get to give a statement. He doesn't get to give a statement. And then we see that the rules about even investigating this claim aren't followed. So, for Mr. Callaway, this is all about rules not being followed and investigations not being done and his concerns not being heard and in terms of how that impacted him, it-- each time it made him feel less and less safe, less and less valued and that's what this case is about. It's about that and a failure to provide a safe work environment to a worker who desperately was looking to be kept safe so that he could do work that he clearly loved to do. And I would assert that we have established that the compensability of this claim as well as the penal-- as well as penalties for an unreasonable investigation. Thank you.

THE ALJ: Thank you. I will write and Opinion and Order in the next 30 days and I will have that sent out.

MS. PHILLIPS POLICH: Thank you.

THE ALJ: Thanks for all of your time today, I appreciate it.

MS. VU: Thanks very much.

THE ALJ: Bye, bye.

(WHEREUPON, the proceedings were adjourned at 3:37 p.m.)

----

**Workers'
Compensation Board
Hearings Division**

## CERTIFICATE OF TRANSCRIPT

I, Joyce Jordan, as the transcriber of the oral proceedings at the June 10, 2025, hearing before Administrative Law Judge Ilias, certify this transcript to be true, accurate, and complete.

Dated this 4th day of August, 2025.


Transcriber

**Workers'
Compensation Board
Hearings Division**

## CERTIFICATE OF TRANSCRIPT

I, Denise Vadnais, as the proofreader of the oral proceedings at the June 10, 2025, hearing before Administrative Law Judge Ilias, certify this transcript to be true, accurate, and complete.

Dated this 4th day of August, 2025.

*Denise H. Vadnais*

Proofreader

Workers'
Compensation Board
Hearings Division

-132-